**No. 25-1127**

# United States Court of Appeals
# for the Fourth Circuit

———————

STEVES AND SONS, INC.,

*Plaintiff-Appellee*,

and

WG TOWANDA LLC; WOODGRAIN, INC.,

*Intervenors-Appellees,*

v.

JELD-WEN, INC.,

*Defendant-Appellant,*

and

JOHN G. PIERCE,

*Intervenor.*

———————

On Appeal from the United States District Court for the
Eastern District of Virginia, Richmond Division
No. 3:16-cv-545-REP, Judge Robert E. Payne

———————

**REDACTED OPENING BRIEF FOR APPELLANT**

———————

BRIAN C. RIOPELLE
MCGUIREWOODS LLP
800 E. Canal Street
Richmond, VA 23219
(804) 775-1084
briopelle@mcguirewoods.com

JOHN C. O'QUINN
*Counsel of Record*
CRAIG S. PRIMIS
MATTHEW S. OWEN
MEGAN MCGLYNN
CAROLINE MILNER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com

———————

*Counsel for Defendant–Appellant JELD-WEN, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1127          Caption: Steves and Sons, Inc. v. JELD-WEN, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

JELD-WEN, Inc.
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                     ☑YES ☐NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     JELD-WEN Holding, Inc. is a publicly traded company that owns 100% of the stock of Appellant
     JELD-WEN, Inc.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                         ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/John C. O'Quinn                    Date: _____5/2/2025_____

Counsel for: Appellant JELD-WEN, Inc.

Print to PDF for Filing

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

STATEMENT OF JURISDICTION..........................................3

STATEMENT OF THE ISSUES...............................................4

STATEMENT OF THE CASE ...................................................4

    A.    A Jury Finds That JELD-WEN's Acquisition of
        Towanda Violated the Clayton Act. ..............................4

    B.    The District Court Orders—and this Court
        Affirms—Divestiture Because Steves Cannot
        Build Its Own Plant.......................................................6

    C.    Steves Builds Its Own Plant, and the Divestiture
        Process Suffers. ............................................................11

    D.    The District Court Denies JELD-WEN's
        Rule 60(b) Motion and Orders Divestiture to
        Woodgrain. ...................................................................16

        1.    The District Court Denies JELD-WEN's
            Rule 60(b) Motion. ..............................................17

        2.    The District Court Overrules JELD-WEN's
            Objections to the Special Master's
            Recommendation. ................................................20

SUMMARY OF THE ARGUMENT ........................................23

STANDARD OF REVIEW.......................................................26

ARGUMENT .........................................................................28

    I.    SIGNIFICANT CHANGED CIRCUMSTANCES
       REQUIRE VACATUR OF THE DIVESTITURE
       REQUIREMENT UNDER RULE 60(b). ............................30

A.   The District Court Erred by Insisting on Divestiture in the Absence of Proven Irreparable Harm..............................................................31

    1.   Equitable Relief May Not Be Enforced Without Irreparable Harm..................................32

    2.   The Crucial Pillar of the Divestiture Order—the Threat to Steves' Business—Is Gone.......................................................................35

    3.   The District Court Offered No Legally Cognizable Reason to Ignore This Changed Circumstance. .....................................................40

B.   The District Court Erred by Insisting on Divestiture When the Lost Competition Identified at Trial Has Been Restored. .........................................45

    1.   Steves' New Plant Restores Competition Between Three Doorskin Manufacturers Without Divestiture.............................................46

    2.   The District Court Impermissibly Gerrymandered Steves' New Plant Out of the Relevant Market to Deny Rule 60(b) Relief. ..................................................................49

II.   THIS DIVESTITURE, TO WOODGRAIN, IS INEQUITABLE. ......................................................................54

A.   Steves Bears the Burden of Proving That Divestiture to Woodgrain Is Equitable. ........................54

B.   The Balance of Hardships Does Not Favor This Divestiture.................................................................58

C.   This Divestiture Is Not in the Public Interest.............64

CONCLUSION ...................................................................69

ii

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.,*
    417 U.S. 703 (1974) ............................................................... 62

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ...................................................... 6, 51, 57

*California v. Am. Stores Co.,*
    495 U.S. 271 (1990) ........................................................ 33, 64

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) .................................................. 39

*eBay Inc. v. MercExchange LLC,*
    547 U.S. 388 (2006) ........................... 32, 34, 37, 54, 57, 60, 61

*First W. Cap. Mgmt. Co. v. Malamed,*
    874 F.3d 1136 (10th Cir. 2017) ............................................. 32

*FTC v. Freeman Hosp.,*
    69 F.3d 260 (8th Cir. 1995) .................................................. 51

*Greenlaw v. United States,*
    554 U.S. 237, 244 (2008) ..................................................... 46

*H&R Block, Inc. v. Block, Inc.,*
    58 F.4th 939 (8th Cir. 2023) ................................................. 42

*Horne v. Flores,*
    557 U.S. 433 (2009) .................................................. 27, 30, 34

---

\* Unless otherwise noted, all alterations have been adopted, emphases added, and footnotes, citations, and quotation marks omitted.

*Liu v. SEC,*
   591 U.S. 71 (2020) ............................................................... 27

*Malaney v. UAL Corp.,*
   2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ............................... 33, 43

*In re Microsoft Corp. Antitrust Litig.,*
   333 F.3d 517 (4th Cir. 2003) ................................................. 32

*Salazar v. Buono,*
   559 U.S. 700 (2010) (plurality opinion) .................................. 26, 34, 47

*SAS Inst., Inc. v. World Programming Ltd.,*
   874 F.3d 370 (4th Cir. 2017) ................................................. 67

*Stanley Works v. FTC,*
   469 F.2d 498 (2d Cir. 1972) .................................................. 51

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024) ........................................................... 32

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
   988 F.3d 690 (4th Cir. 2021)
    ... 1, 6, 8, 9, 10, 11, 27, 28, 29, 30, 32, 36, 37, 39, 43, 45, 47, 50, 53, 55, 58, 59, 68

*United States v. Borden Co.,*
   347 U.S. 514 (1954) ......................................................... 33, 43

*United States v. E.I. du Pont de Nemours & Co.,*
   366 U.S. 316 (1961) ................................................... 27, 28, 44, 53, 64

*United States v. Swift & Co.,*
   286 U.S. 106 (1932) ........................................................... 30

*Valero Terrestrial Corp. v. Paige,*
   211 F.3d 112 (4th Cir. 2000) ................................................ 31

*Verizon Commc'ns Inc. v. L. Off. of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) ........................................................... 46

*Williams Ohio Valley Midstream, LLC v. Kittle,*
   2024 WL 3325532 (4th Cir. July 8, 2024) ........................................ 42

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................... 42, 60, 62

*Wudi Indus. (Shanghai) Co. v. Wong,*
   70 F.4th 183 (4th Cir. 2023) ..................................................... 54, 57

**Statutes**

15 U.S.C. §26 .................................................................. 32, 33, 36

28 U.S.C. §1291 ....................................................................... 4

28 U.S.C. §1331 ....................................................................... 4

28 U.S.C. §1337 ....................................................................... 4

**Other Authorities**

11 Fed. Prac. & Proc. Civ. §2863 (3d ed. June 2024 update) .................. 30

## INTRODUCTION

Over four years ago, this Court affirmed the first-ever divestiture in a private antitrust suit, concluding that "this case [wa]s a poster child for divestiture" based on the record "as it st[ood]" then. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 724 (4th Cir. 2021). But in the intervening years, the facts have changed dramatically—this case no longer "stands" as it did in 2021, let alone when the district court ordered divestiture in 2018. That original divestiture order was premised upon (i) preventing the irreparable harm of plaintiff Steves & Sons, Inc. going out of business and (ii) restoring the competition lost from defendant JELD-WEN, Inc.'s acquisition of a "doorskin" plant in Towanda, Pennsylvania. Seven years later, both rationales have evaporated, and the equities have fundamentally changed. This Court recognized in the first appeal that this could happen, observing that "the divestiture process [wa]s far from over" and ultimately "the district court may have to revisit its ruling." *Id.* Yet despite the changed circumstances, the district court insisted on this now inequitable divestiture.

Today, Steves' very theory for irreparable harm is gone. At the time of the prior divestiture order, Steves represented that it would go out of

business if Towanda were not divested because Steves could neither build its own plant nor obtain doorskins from another reliable source.  Now, that is simply not true.  Steves is completing construction on exactly what it said it could not build: a doorskin plant that will ensure its survival and is expected to be able to produce ███████████████████ ██████████████████.  Unsurprisingly, both the district court and Steves acknowledge that Steves will *not* go out of business, regardless of divestiture.  Nor is there any evidence that Steves faces any other risk of imminent irreparable harm.

As for competition, Steves' new plant restores the lost competition identified at trial.  Far from *restoring* competition, divestiture will instead harm the interests of third-party doorskin purchasers, as the ███████████████████ attested.  Given these fundamental changes to the market, the district court could rationalize divestiture only by impermissibly *redefining* the market that formed the basis for the original divestiture order.

Divestiture would now be doubly unprecedented: Not only was it ordered for the first time in a private antitrust action, but it has been ordered absent any evidence of irreparable harm to the antitrust

2

plaintiff. That defies the rules of equity, which require irreparable harm as a precondition for equitable relief. And it ignores the balance of hardships: JELD-WEN, which has been hobbled by a lengthy divestiture process that Steves itself stymied, not to mention the loss of a major manufacturing plant, faces substantial harm from this belated divestiture. Divestiture today impermissibly uses equity to punish JELD-WEN for acts that are in the distant past and for which JELD-WEN already paid treble damages.

As it stands now, if this case is a "poster child" for anything, it is for relief under Federal Rule of Civil Procedure 60(b)(5). And regardless of the fundamentally changed conditions from 2018, the equities foreclose the district court's most recent decision to order divestiture to its chosen buyer under these circumstances. This Court should reverse both the order denying Rule 60(b) relief from the 2018 divestiture order and the latest 2024 divestiture order.

## STATEMENT OF JURISDICTION

The district court entered final orders requiring divestiture on December 13, 2024. J.A.__[Dkts.2662, 2663, 2664]. After the court extended the time to appeal, J.A.__[Dkt.2691], JELD-WEN filed a timely

notice of appeal on February 6, 2025, J.A.__[Dkt.2703].  The district court had jurisdiction under 28 U.S.C. §§1331, 1337.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.   Whether Rule 60(b) relief from an equitable divestiture order is required where the undisputed evidence shows the plaintiff faces no risk of irreparable harm; there are now three competitors in the relevant market (even without divestiture); and insisting on divestiture now serves only to punish the defendant.

2.   Whether the district court legally and factually erred when it ordered divestiture to a particular buyer because it: inverted the burden of proving that specific relief was equitable; misapplied the equitable balance-of-hardships and public-interest factors; and used equity to punish the defendant.

## STATEMENT OF THE CASE

### A.   A Jury Finds That JELD-WEN's Acquisition of Towanda Violated the Clayton Act.

JELD-WEN is a manufacturer of both doors and doorskins, the latter of which are component parts of interior molded doors.  Doorskins are made by molding fibrous and other material into the shape of a door.

4

A finished door is then manufactured by "sandwiching" a wood frame and a solid or hollow core between two doorskins, which become the front and back of the door.   J.A.__[Dkt.1.11].   JELD-WEN uses some of its doorskins to make its own doors, and it sells other doorskins to other doormakers.   J.A.__[Dkt.976.2].   In antitrust parlance, JELD-WEN is "vertically integrated" because it makes both doorskins—the upstream input—and doors—the downstream product.

Steves is a doormaker that, at least during the trial, did not make its own doorskins and therefore relied on JELD-WEN and other doorskin manufacturers to support its door business. ████████████████

████████████████████████████████████

████████████████████████████

Until 2012, there were three doorskin manufacturers in the United States, all of which were vertically integrated: JELD-WEN, CraftMaster International, Inc. ("CMI"), and Masonite International Corp.  In 2012, JELD-WEN acquired CMI, including its Towanda doorskin plant.  That acquisition decreased the number of domestic doorskin manufacturers from three (JELD-WEN, CMI, and Masonite) to two (JELD-WEN and Masonite).   The Department of Justice investigated JELD-WEN's

acquisition for antitrust concerns but ultimately closed the investigation without taking any action.

In 2016, Steves sued JELD-WEN for violating the Clayton Act. In 2018, a jury concluded that JELD-WEN's acquisition violated the Act by substantially lessening competition in the market for "doorskins used in the United States." J.A.__[Dkt.1025.31]; J.A.__[Dkt.1022.1-2].

## B. The District Court Orders—and this Court Affirms— Divestiture Because Steves Cannot Build Its Own Plant.

The district court ordered several remedies for the Clayton Act violation. To remedy Steves' past harm, it ordered JELD-WEN to pay $36.4 million in treble damages. *Steves*, 988 F.3d at 705. JELD-WEN has since paid those damages and ███████████████████████████ ███████ to resolve that and other claims between the parties.

The district court also granted equitable relief to remedy Steves' anticipated *future* harm. J.A.__[Dkt.1784.148]. Most significantly, it ordered JELD-WEN to divest (*i.e.*, sell) the Towanda plant, making it the first court ever to order the extraordinary injunctive remedy of divestiture in an antitrust suit brought by a private party. *Steves*, 988 F.3d at 703. Adopting a process articulated in *Brown Shoe Co. v. United*

*States*, 370 U.S. 294, 305 (1962), the district court addressed divestiture in two stages. First, it decided whether the divestiture remedy was warranted in general based on the record at the time. Second, after an appeal of the initial order, the court would identify a specific buyer and decide whether divestiture to that buyer was equitable. J.A.__[Dkt.1784.104-05, 148-49].

At the first step (in 2018), the district court ruled that all four equitable factors favored divestiture in general. It stressed that Steves would go out of business absent divestiture because it would not have access to the doorskins needed for manufacturing its own doors and could not make its own doorskins. J.A.__[Dkts.1784.37, 78-79]. The court concluded that Steves' irreparable harm of extinction without divestiture outweighed JELD-WEN's harms from divestiture. It specifically stated that "all of [JELD-WEN's] claimed hardships can be ameliorated by … assuring that divestiture occurs in an environment and under circumstances that will produce a reasonable purchase price." J.A.__[Dkt.1784.96]. Thus, the court ordered JELD-WEN to sell Towanda to a yet-to-be-determined buyer at a "reasonable" price. J.A.__[Dkt.1784.96, 148-49].

7

The district court also ordered a series of remedies governing JELD-WEN's conduct.  Among them, it ordered (i) JELD-WEN to continue supplying Steves in the near term and (ii) any future divestiture buyer to continue supplying Steves for additional years following divestiture.  J.A.__[Dkt.1784.116; Dkt.1852.13-14].[1]

This Court affirmed the original divestiture order.  Like the district court, it ruled that the threat to Steves' existence was critical: "Absent the threat to its survival …, Steves couldn't have shown any of the first three [equitable] factors—a threatened irreparable harm, inadequacy of legal remedies, and that the balance of hardships tipped in its favor." *Steves*, 988 F.3d at 718.

Steves' inability to build its own plant, and thus its dependence on doorskins from some other source, was the lynchpin for finding damages inadequate at the time.  *See id.* at 719.  The district court had concluded that "Steves simply cannot afford to build its own doorskin plant" and so had no "viable alternative means of doorskin supply." J.A.__[Dkt.1784.73-74, 79 n.17].  It based that conclusion on Steves' own

---

[1]  Steves and JELD-WEN later agreed to extend their existing supply agreement until Towanda sold.  J.A.__[Dkt.2111].

repeated representations that it could not build a plant due to "barriers to entry." J.A.__[Trial.Tr.198:1-22]; *see also* J.A.__[Trial.Tr.2632:20-24] ("[I]f it was possible for Sam and Edward [Steves] to … build a plant[,] [t]hey'd do it in a heartbeat. But that's just not a likely option. So they need [the jury's] help."); J.A.__[Post.Remedies.Hr'g.Tr.Day.1.90:3-5] ("Steves is going out of business unless Your Honor issues this divestiture award[.]").

Steves made the same representations to this Court. It argued repeatedly that it "cannot fulfill its doorskin requirements … by building its own doorskin plant," and "[t]he record supports" the "jury['s] reject[ion of] JELD-WEN's evidence … that Steves could build its own doorskin manufacturing plant." Appellee Br., *Steves*, 2019 WL 4409845, at *14, *75 (4th Cir. Sept. 11, 2019); *see also id.* at *13 (including a section on "[t]he impending failure of Steves' business"). Based on the district court's findings and Steves' arguments, this Court concluded that without divestiture, Steves would face the irreparable harm of the "permanent loss of [its] business," *Steves*, 988 F.3d at 719, and a damages award "wouldn't fully repair Steves' injury because it wouldn't keep Steves in business," *id.* at 719 n.14.

9

As to the balance of hardships, this Court concluded that "the district court acted within its discretion." *Id.* at 721. It recognized that divestiture would "cost JELD-WEN a great deal financially and would reduce its doorskin output," *id.*, and absent the threat to Steves' survival, the balance would be different, *id.* at 718. But because "[r]ecord evidence support[ed] the [district] court's finding that Steves faces collapse without injunctive relief," this Court concluded the "significant possibility that a party would be driven out of business carries great weight when balancing hardships." *Id.*

Turning to the public interest, this Court affirmed that "divestiture would be in the public interest because it would add a third supplier to the doorskin market, thereby promoting competition." *Id.* at 721. It emphasized the need to end the "duopoly" created by the CMI acquisition, *id.* at 724, reasoning that divestiture would "once again" *restore* three domestic doorskin competitors—a goal that "[n]othing in the record" showed "could be accomplished short of divestiture," *id.* at 707.

This Court warned, however, that "the divestiture process [wa]s far from over." *Id.* at 724. It explained that "[i]f the special master can't locate a satisfactory buyer, the district court may have to revisit its

10

ruling," and it emphasized that JELD-WEN retained the right to "challenge whether a sale to [a] particular buyer will serve the public interest." *Id.*

### C. Steves Builds Its Own Plant, and the Divestiture Process Suffers.

This Court's warning proved prescient. On remand, the district court appointed a Special Master to "locate a satisfactory buyer." *Id.*; J.A.__[Dkt.1863.2]. The Special Master (funded by JELD-WEN, per court order, J.A.__[Dkt.1852.8-9]) attempted to do just that. But each of three successive bidding rounds went awry, resulting in lower and lower bids for Towanda over the intervening years.

After the first round concluded in November 2021, the Special Master recommended that the district court accept a ███████ bid from ███████████████████. But Steves, which had submitted its own ███████ bid, objected. ████████████████████████ █████████████████████████████████████████ █████████████████████

After Steves thwarted ███████████ acquisition of Towanda, the Special Master was forced to initiate a second bidding round—which Steves also affected. Four days after Steves learned that bidder outreach

11

had begun, Steves publicly announced that—despite all its previous representations—it was building its own doorskin plant. Although Steves' publicly-available estimates for production varied widely, the revelation of its forthcoming plant immediately affected the divestiture process and bidders' interest. *Compare, e.g.*, J.A.__[Dkt.2470-6], *with* J.A.__[Dkt.2457-2] (article estimating a 20-million doorskin capacity revised to estimate capacity "in excess of 10 million door skins"). All of JELD-WEN's third-party contracts would be sold to the divestiture buyer. J.A.__[Dkt.1852.4].

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ But Steves' new plant would establish a third domestic supplier and would decrease (if not eliminate) Steves' demand for third-party doorskins. As the Special Master acknowledged, ████████████████████████████████████



---

[2] That fear was heightened by the supply agreement with Steves that would be assigned by court order to the Towanda buyer upon divestiture. J.A.    [Dkt.2282.9-12; Dkt.2395]; *see also supra* p.8.



14

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████ Overall, the

winning bids plunged ███ between the first and third rounds.

The Special Master ultimately recommended divestiture to Woodgrain for $115 million. He emphasized "the many times that the landscape changed during" the divestiture process, "often unexpectedly upending plans and resulting in a process that was far more protracted and complicated than desired or anticipated." J.A.__[Dkt.2551-1.7 n.5]. "[N]umerous factors … affected the amount of consideration that bidders were willing to offer, including a changing industry landscape with the announcement of the new Steves facility." J.A.__[Dkt.2551-1.33]. Indeed, the Special Master adopted (and appended) his antitrust advisors' report, which candidly acknowledged this significant market change's disruption of the bidding process: ███████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████

15

After recounting these "unexpected[]" market changes, the Special Master concluded "Woodgrain was the only final bidder fully committed to the process and the only one to execute the agreements necessary to consummate the divestiture." J.A.__[Dkt.2551-1.35]. ██████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████

### D. The District Court Denies JELD-WEN's Rule 60(b) Motion and Orders Divestiture to Woodgrain.

Responding to the same changed circumstances that scared bidders and tanked Towanda's valuation, JELD-WEN moved to vacate the original divestiture order under Rule 60(b)(5). It separately objected to the Special Master's recommendation. On December 13, 2024, the district court denied JELD-WEN's motion, overruled JELD-WEN's objections to the Special Master's recommendation, and ordered divestiture to Woodgrain. J.A.__[Dkts.2663, 2661, 2662].

16

### 1. The District Court Denies JELD-WEN's Rule 60(b) Motion.

The district court refused to vacate the original divestiture order even though Steves' plant eliminated the threat to Steves' existence and restores a third doorskin supplier in the market.

The court acknowledged that Steves had used its "multimillion dollar payment from JELD-WEN" "to fund the building of its own doorskin plant," and accordingly, "Steves no longer faces the risk of extinction." J.A.__[Dkt.2663.29, 35]. Nevertheless, it opined that there was no "changed condition." J.A.__[Dkt.2663.19]. Notwithstanding that there were now *three* doorskin suppliers without divestiture, the court asserted Steves (and other "independent" doormakers that do not manufacture doorskins) somehow "face the same market for interior molded doorskins that the jury found to be anticompetitive." J.A.__[Dkt.2663.19, 34]; *see also* J.A.__[Dkt.2663.20] ("[W]ithout divestiture, the domestic market for doorskins will remain as it was at the time of trial."); J.A.__[Dkt.2663.20].

To assert that conclusion, the court changed the antitrust market from the one defined at trial—"doorskins used in the United States," J.A.__[Dkt.1025.31]—to one that includes only manufacturers that

17

(presently) supply third parties ("supplier[s] to the other Independents,"
J.A.__[Dkt.2663.17]).  It reasoned Steves would not sell to independents
(based on Steves' own anticipated demand) and would thus "remain a net
buyer of doorskins." J.A.__[Dkt.2663.17].  From there, the court held that
absent divestiture, there would be only two doorskin manufacturers
willing to supply third parties—JELD-WEN and Masonite—ignoring
that Steves will supply at least itself ███████████████████████████
████████████████.    J.A.__[Dkt.2663.17].    After redefining the
market, the court rationalized "the market [would] remain[] the same."
J.A.__[Dkt.2663.21].  And because JELD-WEN had previously employed
a "foreclosure" strategy (when Steves lacked its own doorskins), the court
found that, without divestiture, JELD-WEN could still be incentivized to
foreclose independents—*i.e.*, limit their ability to purchase JELD-WEN's
doorskins.  J.A.__[Dkt.2663.21].

The district court did not address JELD-WEN's argument that the
market at trial—the market the jury found to have suffered substantially
lessened competition—included *all* doorskins used domestically, and
thus could not rationally exclude Steves' new plant.  Nor did it explain
how Steves' injection of millions more doorskins into the market could

18

have no effect or how the market had not changed at least for Steves—the only entity seeking relief—since Steves will now have three supply options: itself, JELD-WEN, and Masonite.

As to the absence of irreparable harm, the court emphasized that independents may benefit from divestiture even if Steves "no longer faces the risk of extinction." J.A.__[Dkt.2663.32-35]. It gave no weight to the expressed views of ████████████████████████████████, which repeatedly told the Special Master and district court that divestiture would *harm* its interests. J.A.__[Dkt.2663.24 n.13]; ██████████ ███████████████████████ The district court did not even address ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

The district court also intimated that Steves might face some new irreparable harm absent divestiture because some doorskins JELD-WEN sold Steves after the trial were defective. It asserted those "quality problems have created harm to the reputation of Steves and portend[] a loss of good will, threatening a loss of both former and potential customers." J.A.__[Dkt.2663.31]. The court cited no evidence suggesting

the CMI acquisition itself caused the alleged defects. Nor did it cite any evidence that Steves will suffer any harm from a "loss of good will."

In sum, the district court ruled that JELD-WEN had not "carried its burden to show that divestiture would be *so* inequitable as to require the Court to eliminate that remedial aspect of the [final judgment]." J.A.__[Dkt.2663.32].

### 2. The District Court Overrules JELD-WEN's Objections to the Special Master's Recommendation.

The court also rejected JELD-WEN's arguments for why a new decree ordering the specific divestiture to Woodgrain is inequitable. It first emphasized that it had already made the *Brown Shoe* step-one decision that divestiture was equitable in general. J.A.__[Dkt.2661.17-24]. Next, the court applied *Brown Shoe* by inverting the burden of proof for showing a particular remedy is equitable. Under its approach, although the party seeking divestiture (Steves) bore the burden as to the equitable considerations at step one, divestiture must proceed unless the party opposing it (JELD-WEN) offered "sufficient evidence" that the specific equitable relief proposed was *in*equitable at step two. *See* J.A.__[Dkt.2661.16].

20

As to the balance of hardships, the court never actually weighed the (now-nonexistent) irreparable harm to Steves without divestiture against the harm to JELD-WEN from divestiture.  Instead, it focused on whether JELD-WEN would receive a reasonable price for Towanda.  And it found that JELD-WEN had not satisfied the burden the court had imposed of proving "the price Woodgrain intends to pay for Towanda is unfair or unreasonable."  J.A.__[Dkt.2661.17]; *see also* J.A.__[Dkt.2661.39].

The district court reached that conclusion despite JELD-WEN's unrebutted evidence that Towanda was worth ███████████████ ████ more than Woodgrain's $115 million offer."  J.A.__[Dkt.2661.40]. It gave no weight to the extensive analysis of JELD-WEN's expert, ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████  Instead, the court reasoned that a low price was acceptable "in this first-of-its-kind forced sale" because "JELD-WEN is being made to sell Towanda by force."  J.A.__[Dkt.2661.41].  Despite having denied JELD-WEN's Rule 60(b) motion, the court relied on all that had changed since its 2018 order (including the "changed industry landscape due to

Steves' new plant announcement"), to justify Woodgrain's purchase price as the price "then obtainable" under those changed circumstances. J.A.__[Dkt.2661.45-47].

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ the court opined that "JELD-WEN ha[d] failed to make a showing that Woodgrain acquiring Towanda would harm the public interest," J.A.__[Dkt.2661.32]. As for JELD-WEN's argument that its integrated network of plants maximizes production efficiencies and minimizes freight costs to the independents' benefit, the court said that went only to "whether divestiture itself is justified." J.A.__[Dkt.2661.27]. It reasoned that all that mattered now was "whether Woodgrain could not efficiently operate Towanda to the same extent that a different acquirer"—not JELD-WEN—"could operate Towanda." J.A.__[Dkt.2661.29] (emphasis omitted).

Given the district court's rulings, the parties consummated the divestiture on January 17, 2025, with the express understanding that JELD-WEN did not forfeit any appellate rights. ███████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

## SUMMARY OF THE ARGUMENT

The district court's two orders turn equity on its head, while disregarding this Court's prior admonitions that the divestiture process was far from complete and intervening developments could require revisiting whether it remained equitable. Ultimately, these orders serve only to punish JELD-WEN for past acts that—as history has shown— have been more than adequately compensated through treble damages. Indeed, Steves used JELD-WEN's damages to construct its own plant— creating a third doorskin manufacturer that fundamentally reshapes the

23

doorskin market. And that plant eliminates the only irreparable harm that supported divestiture in the first place: the threat to Steves' existence. Enforcing the extreme remedy of divestiture without irreparable harm is an unprecedented misuse of equity and inconsistent with this Court's prior ruling. *Both* of the district court's orders should be reversed; reversal of *either* is sufficient to forgo divestiture.

*First*, significant changes in circumstances have rendered divestiture inequitable, compelling relief under Rule 60(b)(5). This Court upheld the original divestiture order because that was the *only* remedy that would prevent the then-imminent risk that Steves would go out of business and restore three suppliers to the doorskin market. Neither this Court nor the district court could identify any other remedy for those concerns, in no small part because Steves repeatedly swore it could not build its own plant.

Neither concern remains. Steves will not go out of business—and admits as much—precisely because it built a plant that restores competition. The prior decisions were predicated on the notion that Steves could not build its own plant; but now, it has done that. That alone compels Rule 60(b) relief. Nor has Steves shown it faces any other

24

imminent risk of harm that could justify divestiture.  Neither Steves nor the district court could identify any authority that suggests equitable relief—let alone the extraordinary remedy of divestiture—can be enforced absent irreparable harm.  This Court should not be the first to create such an unprecedented exception to the irreparable-harm requirement.

Nor does any purported harm to the market remain.  Steves' plant *restores* three suppliers to the doorskin market, exactly as before the CMI acquisition.  The district court's tortured response—inventing a new market definition seven years after trial to disregard this critical development—is legal error.

*Second*, separate from whether these changed circumstances required revisiting its original divestiture order, the district court erred in ordering *this* divestiture to Woodgrain as the world exists *today*. Ignoring centuries of equity precedent, the district court forced JELD-WEN to bear the burden of proving that divestiture to Woodgrain was *in*equitable instead of requiring Steves, the party seeking equitable relief, to prove that this divestiture was *equitable*.

Regardless of that procedural error, neither the balance-of-hardships factor nor the public-interest factor favors this divestiture. As this Court recognized, the original divestiture order could not answer the divestiture question for all time. Today, the balance decidedly tips in JELD-WEN's favor because Steves no longer faces any irreparable harm, whereas JELD-WEN faces significantly increased harm—including the below-value price for Towanda and massive disruption to its remaining business. And as the ███████████████████ made clear, divestiture will not further the public interest—quite the opposite.

In sum, the principal reasons justifying divestiture no longer exist, and divestiture to Woodgrain cannot satisfy the requirements for equitable relief. The district court's dogged insistence on divestiture served no purpose except to punish JELD-WEN for its loss at trial—a loss for which it already paid treble damages. That is an unlawful exercise of equitable authority, and this Court should reverse.

## STANDARD OF REVIEW

Equitable relief is an extraordinary remedy that "is not granted as a matter of course," and may be ordered only if a plaintiff satisfies stringent requirements. *Salazar v. Buono*, 559 U.S. 700, 714 (2010)

26

(plurality opinion).  The plaintiff must demonstrate "(1) that it ha[s] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, [a]re inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Steves*, 988 F.3d at 705.

Equity may not be used to punish instead of remedy.  *See, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) ("Courts are not authorized in civil proceedings to punish antitrust violators, and relief must not be punitive."); *Liu v. SEC*, 591 U.S. 71, 82 (2020) (courts "circumscribe[d] [a profits remedy] in multiple ways to avoid transforming it into a penalty outside their equitable powers").

This Court reviews orders awarding equitable relief as well as decisions denying Rule 60(b) relief for abuse of discretion.  *Horne v. Flores*, 557 U.S. 433, 447 (2009); *Steves*, 988 F.3d at 719.  "A district court abuses its discretion when it relies on incorrect legal conclusions or clearly erroneous findings of fact, or otherwise acts arbitrarily or irrationally in its ruling." *Steves*, 988 F.3d at 719.

27

# ARGUMENT

In 2018, the district court imposed the "most drastic" equitable remedy available in the antitrust context: divestiture. *du Pont*, 366 U.S. at 326. That decision was all the more extraordinary because it was the first time any court had "ever ordered divestiture in a private suit" at the request of a plaintiff with a competitive stake in the market. *Steves*, 988 F.3d at 703. This Court affirmed the decision to pursue divestiture because—at the time—JELD-WEN's acquisition of Towanda was an immediate "threat to [Steves'] survival." *Id.* at 718. Critical to that threat was the purported fact—as Steves repeatedly represented—that it was not "feasible" for Steves to build its own doorskin plant. *E.g.*, *id.* at 702. "Absent the threat to its survival…, Steves couldn't have shown any of the first three [equitable] factors—a threatened irreparable injury, inadequacy of legal remedies, and that the balance of hardships tipped in its favor." *Id.* at 718. Indeed, it was only the "threatened collapse" of a business that had "been family-owned for 150 years" that "couldn't be repaired by money damages." *Id.* at 719. Under these unique circumstances, this Court also affirmed on the "tougher question" of whether divestiture was the appropriate remedy. *Id.* at 720.

28

Yet, in narrowly affirming based on the then-existing record, this Court admonished that "the divestiture process is far from over," and "the district court may have to revisit its [divestiture] ruling." *Id.* at 724. It observed that if no "satisfactory buyer" could be found, or if the "particular" divestiture would not "serve the public interest," divestiture would not be appropriate. *Id.* And it recognized that JELD-WEN could object to the divestiture ultimately ordered. *Id.*

Today, the crucial equitable premises for divestiture have entirely vanished: It is undisputed Steves faces no risk of going out of business absent divestiture. To the contrary, Steves has done what it said was undoable—built its own plant, █████████████████████████ ████████████████████████—ensuring there are again *three* competitors in the doorskin market. Injunctive relief now is fundamentally inequitable. And even if divestiture to some purchaser might hypothetically be equitable, Steves did not and cannot show that *this* divestiture to Woodgrain is equitable. For both reasons (though either is sufficient), this Court should reverse.

## I.  SIGNIFICANT CHANGED CIRCUMSTANCES REQUIRE VACATUR OF THE DIVESTITURE REQUIREMENT UNDER RULE 60(b).

This case falls within the heartland of Rule 60(b).  Rule 60(b)(5) provides for relief from a judgment when "applying it prospectively is no longer equitable."  It is "based on the historic power of a court of equity to modify its decree in the light of changed circumstances."  11 Fed. Prac. & Proc. Civ. §2863 (3d ed. June 2024 update).  An "injunction *directed to events to come* … is subject always to adaptation as events may shape the need."  *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932); *see Horne*, 557 U.S. at 447-48.  This Court recognized these time-tested principles and their potential applicability here all the way back in 2021.  Indeed, after the district court adopted a two-step approach and ordered only a *future* divestiture at the first step, the Court acknowledged that "the divestiture process [wa]s far from over."  *Steves*, 988 F.3d at 724.

In keeping with these principles, once a party "establish[es] that changed circumstances warrant relief, … a court abuses its discretion when it refuses to modify an injunction … in light of such changes."  *Horne*, 557 U.S. at 447.  In other words, "modification or vacatur of an injunction under Rule 60(b)(5) … is *required* where there has been a

30

significant change … in factual conditions." *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 122 (4th Cir. 2000). That is exactly what JELD-WEN showed here.

Notwithstanding the undeniable changed circumstances, the district court refused to change the course it had set for divestiture. It did so despite the reality that (i) Steves faces no existential risk to its business (which also fundamentally changes the balance of hardships), and (ii) Steves' plant creates a third competitor in the doorskin market— exactly what the prior rulings said was needed to restore competition. Each changed circumstance independently requires vacating the outdated divestiture requirement. Continued pursuit of divestiture is not remedial—it is unlawfully punitive. The order denying Rule 60(b) relief from the 2018 divestiture order should be reversed.

### A. The District Court Erred by Insisting on Divestiture in the Absence of Proven Irreparable Harm.

The equitable remedy of divestiture cannot be enforced when a private plaintiff has no irreparable harm to redress. This divestiture— and this Court's affirmance—turned on the critical fact that Steves' very existence was threatened absent divestiture. But it is undisputed that is no longer the case. Neither Steves nor the district court could identify a

single analogous case in which a court enforced equitable relief in the absence of proven irreparable harm. *See, e.g.*, J.A.__[Dkt.2643.19:11-25, 51:24-52:4]. The district court offered no legally cognizable reason why this case should be the first.

### 1. Equitable Relief May Not Be Enforced Without Irreparable Harm.

It is blackletter law that an injunction is warranted only to remedy "an irreparable injury." *Steves*, 988 F.3d at 705 (quoting *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006)). The requirement that a plaintiff show he will "suffer irreparable harm in the absence of [injunctive] relief" is a "commonplace consideration[]" that "reflect[s] a practice with a background of several hundred years of history." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *see also* 15 U.S.C. §26 (injunctive relief should issue under the Clayton Act "when and under the same conditions and principles as … granted by courts of equity"). Irreparable harm is understood to be "the single most important prerequisite" to injunctive relief. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017); *see also In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 527-28 (4th Cir. 2003).

32

Were there any doubt, the Clayton Act explicitly recognizes that a private plaintiff may obtain an injunction only upon proving that it will personally suffer irreparable harm: It must "show[] that the danger of *irreparable loss* or damage is immediate." 15 U.S.C. §26.

The irreparable harm must also be *personal* to private antitrust plaintiffs, a requirement that separates them from government plaintiffs. "[A] private plaintiff may obtain injunctive relief against [antitrust] violations only on a showing of 'threatened loss or damage'; and *this must be of a sort personal to the plaintiff.*" *United States v. Borden Co.*, 347 U.S. 514, 518 (1954); *see also Malaney v. UAL Corp.*, 2010 WL 3790296, at *13 (N.D. Cal. Sept. 27, 2010), *aff'd,* 434 F. App'x 620 (9th Cir. 2011) (private plaintiffs could not obtain injunction where they had not "establish[ed] any significant harm they will personally suffer" and alleged only injuries that "would be suffered by the general air carrier flying public as a whole"). And because a private plaintiff must have some injury "to his own interests," a court's "power to order divestiture" in private suits cannot "be exercised in every situation in which the Government would be entitled to such relief" if it were a party. *California v. Am. Stores Co.*, 495 U.S. 271, 295-96 (1990).

33

It follows that, as a matter of law, a court cannot proceed with an injunction when a private party's irreparable harm no longer exists. A court has no authority to order any equitable relief at the outset without a clear showing of irreparable harm. *See eBay*, 547 U.S. at 391. When the circumstances change such that irreparable harm no longer exists, a court exceeds its authority by plowing forward with the injunction. Simply put, the absence of irreparable harm is a significant change in circumstances that renders an injunction inequitable to enforce. *See Salazar*, 559 U.S. at 715 (holding that it "was error" for district court to "conclud[e] that nothing of moment had changed"); *see also id.* at 714-15 ("[A] court must never ignore significant changes in the … circumstances underlying an injunction lest the decree be turned into an instrument of wrong."); *Horne*, 557 U.S. at 470 (criticizing a court's failure to consider "all of the changed circumstances" because they could render "continued enforcement of the District Court's original order … inequitable [under] Rule 60(b)(5)").

To conclude otherwise would create inequitable results. A court *must* deny equitable relief when a plaintiff fails to establish a significant threat of irreparable harm at the outset. Yet, under the district court's

view, once a court has found such a threat, it can enforce an injunction for the first time even after the threat has indisputably disappeared. Such a rule cannot be squared with equity, and to JELD-WEN's knowledge, no other court has gone so far.

Here that means the divestiture order must be vacated because: (a) the threatened irreparable harm underlying it—Steves going out of business—is indisputably no longer a threat (which also dramatically alters the balance of hardships); and in any event, (b) there is no *evidence* that Steves faces any other imminent irreparable harm. Rather than create a novel exception to the irreparable-harm requirement, this Court should hold that equitable relief cannot stand when the irreparable harm upon which it was premised no longer exists.

### 2. The Crucial Pillar of the Divestiture Order—the Threat to Steves' Business—Is Gone.

The threat that Steves would go out of business was the sole irreparable harm that justified the divestiture order and this Court's affirmance. Seven years later, Steves undisputedly no longer faces that irreparable harm. *See* J.A.__[Dkt.2663.35] (district court recognizing that "Steves no longer faces the risk of extinction"); ███████████

████████████████████████████████████████

████████████; J.A.__[Dkt.2538.20].  And the fact that Steves was able to use the treble damages award to build a plant and eliminate the very risk that justified equitable relief further shows damages were an adequate remedy at law.  Denying Rule 60(b) relief and proceeding with divestiture despite these significant changed circumstances is an abuse of discretion.

During the first stage of this litigation, both courts left no doubt that divestiture was ordered to remedy a particular irreparable harm: that Steves would go out of business without divestiture.  As this Court put it, "[t]he [district] court properly found that equitable relief under the Clayton Act, 15 U.S.C. §26, was appropriate *because the merger created a significant threat that Steves will go out of business*."  *Steves*, 988 F.3d at 699; *see also id.* at 721 ("Record evidence supports the court's finding that Steves faces collapse without injunctive relief."); J.A.__[Dkt.1784.87] ("If the Court does not order an equitable remedy …, Steves will likely lose its entire business.").  To conclude that Steves' loss of its business was irreparable, the district court expressly dismissed the possibility that Steves could build its own plant: Steves "building a doorskin plant of its own [wa]s not a viable alternative way to supply Steves' doorskin needs after 2021."  J.A.__[Dkt.1784.79]; *see also*

36

J.A.__[Dkt.1784.79 n.17] (Steves "simply cannot afford to build its own doorskin plant"); *Steves*, 988 F.3d at 702 (not "feasible" for Steves to build a plant).

The purpose of this divestiture was to protect Steves from extinction. In fact, the entire divestiture analysis turned on that threat. This Court concluded that, "*[a]bsent the threat to its survival* …, Steves couldn't have shown *any of the first three [equitable] factors*—a threatened irreparable injury, inadequacy of legal remedies, and that the balance of hardships tipped in its favor." *Steves*, 988 F.3d at 718. Had Steves not established that threat, the district court would have lacked authority to order divestiture. *See eBay*, 547 U.S. at 391.

In the intervening seven years, however, that foundational premise has crumbled. Both the district court and Steves conceded that "Steves no longer faces the risk of extinction." J.A.__[Dkt.2663.35]; *see also* J.A.__[Dkt.2538-4.10]; ███████████████████████████████

████████████████████████████████████████

███████. Instead, Steves has thrived, increasing its doorskin orders and building its own plant. During the initial litigation, Steves said it needed ██████████████ doorskins annually to survive; its orders have now

37

increased to ████████ doorskins in 2023 alone. J.A.__[Dkt.1784.54]; J.A.__[Dkt.2457-9 ¶15]. Moreover, Steves has built the plant that the district court earlier dismissed as not "viable." That plant ████████

████████████████████████████████████████

████████████████████████████████████████

████████████.[3] Not only is Steves' survival now secure, but Steves will, in its own words, ████████████████████████████

████████████████ J.A.__[Dkt.2308.3].

The circumstances have thus changed dramatically since divestiture was ordered seven years ago. Steves obtained divestiture to prevent the loss of its business. Steves then built the plant it swore it could not build—causing multiple attempts at divestiture to fail and protracting these proceedings for years. *See supra* pp.11-16. During this unusual delay between when divestiture was ordered and a buyer was found, time has proven that Steves' threatened irreparable harm has not

---

[3] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

and will not come to pass. It would be inequitable to now insist on divestiture premised upon irreparable harm that no longer exists.

Time has also shown that Steves had an adequate remedy at law— an equitable requirement intertwined with the irreparable-harm requirement. It is well established that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough" to warrant injunctive relief. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Such injuries can be remedied with monetary damages—a remedy at law—and are therefore not *irreparable*. *See Steves*, 988 F.3d at 718 ("The general rule is that a plaintiff's harm is not irreparable if it is fully compensable by money damages.").

Here, money damages were sufficient to remedy Steves' injury. As the district court acknowledged, Steves used its "multimillion dollar payment from JELD-WEN … to fund the building of its own doorskin plant" and "reduc[e] its dependence on JELD-WEN." J.A.__[Dkt.2663.6, 29]. Sympathizing with Steves, the court believed Steves should not be "depriv[ed]" of the divestiture just because Steves "used the monetary damages to insulate itself from ever again having to face the serious risk

39

that necessitated this case." J.A.__[Dkt.2663.34]. But Steves' ability to "insulate itself" from that risk of extinction with "monetary damages" does not support proceeding with divestiture; it shows damages were adequate and requires vacating the divestiture order.

### 3. The District Court Offered No Legally Cognizable Reason to Ignore This Changed Circumstance.

The district court offered two reasons for denying JELD-WEN relief despite Steves no longer facing an existential threat to its business. Neither is a legally permissible basis for denying Rule 60(b) relief given the absence of the singular irreparable harm that was the basis for compelling divestiture in the first place.

*First*, the district court invented—in two sentences—a new and entirely unsubstantiated irreparable harm: the risk that Steves' goodwill may be harmed absent divestiture. *See* J.A.__[Dkt.2663.31]. According to the court, alleged "quality problems" with some of Steves' orders from JELD-WEN in the past few years "have created harm to the reputation of Steves and portend[] a loss of good will, threatening a loss of both former and potential customers." *See* J.A.__[Dkt.2663.31]. It then recited the general rule that "[l]oss of good will" can "constitute irreparable harm." *See* J.A.__[Dkt.2663.31].

40

This reasoning has several problems.  To begin, the initial divestiture order—and this Court's narrow affirmance—was premised upon the irreparable harm of the loss of Steves' business because Steves could not obtain doorskins.  This new so-called irreparable harm is categorically different from that key assumption and fundamentally changes the equitable calculus.  Whether a purported new risk of injury could justify injunctive relief is irrelevant to whether the basis for the existing divestiture order has been vitiated.  Denying Rule 60(b) relief on such a basis is unprecedented.

Regardless, assuming some new, substitute irreparable harm could warrant denying Rule 60(b) relief, Steves has not *proven* the existence of such harm in this case with *evidence*.  Indeed, Steves provided *no* evidence that it faced an imminent threat to its goodwill or reputation (such as a declaration that a specific customer contract might be lost because of the alleged quality issues).  Nor did Steves provide evidence that such hypothetical injury would be irreparable, let alone that JELD-WEN's acquisition of Towanda caused it.  And Steves did not purport to show how such an injury would persist given its ability to supply its own needs.

Courts cannot issue injunctions "based only on a *'possibility'* of irreparable harm"; that "standard is too lenient." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21-22 (2008). It was insufficient for Steves to speculatively assert in its Rule 60(b) opposition that some irreparable harm might occur in the abstract, untethered to the antitrust claims here. J.A.__[Dkt.2538.20-24]. And the district court erred by rubber-stamping that unsubstantiated assertion of irreparable harm. *See Williams Ohio Valley Midstream, LLC v. Kittle*, 2024 WL 3325532, at *4 (4th Cir. July 8, 2024) (unpublished) (reversing a preliminary injunction where plaintiff "presented no evidence" and the district court "adopted [plaintiff's] assertions of irreparable harm that [we]re speculative and unsupported by evidence"); *see also H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (reversing preliminary injunction where the "paucity of evidence" rendered plaintiff's "worry about potential negative publicity and loss of intangible assets, such as reputation and goodwill … speculative").

*Second*, the district court suggested that Steves' lack of irreparable harm did not matter because divestiture would still benefit other independents. *See* J.A.__[Dkt.2663.33-34]. But that is legally irrelevant

42

to the irreparable-harm analysis.  A private antitrust plaintiff, unlike the government, may obtain injunctive relief only after showing irreparable harm *personal to itself*—not to others.  *See Borden*, 347 U.S. at 518; *see also Malaney*, 2010 WL 3790296, at *13.  And although harm to others is *relevant* in crafting a remedy, it is not legally *sufficient* to say divestiture may purportedly benefit other independents (which, in any event, it will not, *see infra* pp.64-68).  Absent imminent irreparable injury *to Steves*, no injunction may issue in this private antitrust action.

The district court erred by treating Steves akin to the government as plaintiff and conflating the separate tasks of *first* finding irreparable harm as a predicate to equitable relief and *only then* considering the independents in crafting a specific equitable remedy.  Indeed, in the prior appeal it was only within the confines of *choosing a remedy* that this Court concluded it was proper to "consider[] which equitable remedy would best promote competition."  *Steves*, 988 F.3d at 721.  Because "courts may *fashion equitable remedies* with that broader purpose in mind," the district court did not need to choose a remedy "that helped only Steves" and "wouldn't promote competition in the doorskin market." *Id.* at 720.

But the question under Rule 60(b) is different. Where the only imminent irreparable harm Steves faced is gone, no equitable relief—much less divestiture—is permissible. The district court legally erred in reading this Court's prior opinion to suggest that the interests of non-plaintiff independents can serve as a "reason for affirming the remedy of divestiture," regardless of any irreparable harm to Steves. J.A.__[Dkt.2663.33].

Ultimately the district court was more focused on forcing "JELD-WEN to take" the "stiff medicine" of divestiture than on whether that remedy was still permissible as a matter of law and equity now that Steves faces no risk of going out of business. J.A.__[Dkt.2663.35]. That approach substitutes the remedial goals of equity with punishment. Although "[d]ivestiture is itself an equitable remedy designed to protect the public interest," the purpose of an injunction must always remain remedial. *du Pont*, 366 U.S. at 326-27. Because courts lack "author[ity] in civil proceedings to punish antitrust violators," the "relief must not be punitive." *Id.* Denying Rule 60(b) relief where the irreparable-harm rationale undergirding the extreme (and in this context, unprecedented) remedy of divestiture has dissipated is impermissibly punitive.

44

In all events, because Steves has no proven irreparable harm, that absence necessarily (and substantially) changes the balance-of-hardships factor, which requires weighing the harms to the plaintiff against those to the defendant. *See Steves*, 988 F.3d at 721. While Steves no longer has irreparable harm on its side, JELD-WEN's harms have only increased, as explained below. *See infra* pp.57-64. That fundamentally changed balance of hardships is further reason why Rule 60(b) relief should be granted.

## B. The District Court Erred by Insisting on Divestiture When the Lost Competition Identified at Trial Has Been Restored.

If the lack of irreparable harm were not enough, there is another changed circumstance that requires Rule 60(b) relief: Divestiture is no longer necessary to "once again place three domestic doorskin suppliers in the doorskin market." *Steves*, 988 F.3d at 707. Steves' new plant restores a three-competitor market (JELD-WEN, Masonite, and Steves) absent divestiture. The district court sidestepped that fact by crafting an entirely new, gerrymandered antitrust market that impermissibly excluded Steves from its doorskin marketplace. But that was not the

45

market the jury relied on to find liability, nor on which the 2018 divestiture remedy was predicated.

An equitable remedy must be tailored to the wrong at issue. Courts exercising their equitable authority "do not, or should not, sally forth each day looking for wrongs to right." *Greenlaw v. United* States, 554 U.S. 237, 244 (2008). That would impermissibly cast the court in the role of "central planner[]," "a role for which [it is] ill suited." *Verizon Comm'ns Inc. v. L. Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). It is too late in the day for the district court to move the goalposts to deny Rule 60(b) relief. As it now stands in the relevant market (that was the basis for divestiture), divestiture is a solution in search of a problem.

### 1. Steves' New Plant Restores Competition Between Three Doorskin Manufacturers Without Divestiture.

The district court and this Court originally found divestiture served the public interest on the theory that divestiture alone could "once again *restore three competitors* who make and sell doorskins." J.A.__[Dkt.1784.110]. The district court stated: "Divestiture would once again place *three* domestic doorskin suppliers in the doorskin market. Nothing in the record points to how that could be accomplished short of

46

divestiture.     Neither    party    has    posited    an    alternative."
J.A.__[Dkt.1784.111].    Likewise, this Court explained that the CMI
"merger ha[d] resulted in a duopoly," but it was "reasonable to expect
that a *third* supplier—even one that's vertically integrated—will promote
competition, as CMI did before the 2012 merger." *Steves*, 988 F.3d at 724.

Seven years later, Steves' construction of its plant is a significant
changed circumstance that "restore[s] *three* competitors who make and
sell   doorskins,"   J.A.__[Dkt.1784.110],   even   viewing   Steves   as   a
"vertically-integrated" competitor, *see also Steves*, 988 F.3d at 723
(recognizing that, if Steves purchased Towanda, there would be three
vertically-integrated suppliers and "three is better than two").  As Board
co-chairman Edward Steves put it, Steves' new plant will "eliminate" the
"duopoly." J.A.__[Dkt.2457-2].  That is a seismic admission.  Both courts
previously believed the market could *only* be increased from two to three
manufacturers by forcing divestiture.  That has proven wrong both in
theory and fact, requiring Rule 60(b) relief.  *See Salazar*, 559 U.S. at 714
(significant changes to "what the court believe[d] [would] be the future
course of events" warrants modification of injunction).

47

Confirming that Steves' presence in the market is a game-changer, the Special Master observed that the "industry landscape" was "changing … with the announcement of the new Steves facility." J.A.__[Dkt.2551-1.33]. ███████████████████████████████████

████████████████████████████████████████

███ That goes well beyond *restoring* a *third* competitor—the very premise of the divestiture.[4]

Market participants likewise confirmed the fundamental change wrought by Steves' market entry by devaluing Towanda as a standalone entity (despite its continued value to JELD-WEN). ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Simply put, the bid process for

---

[4] The district court faulted the Special Master's advisors for "not tak[ing] into account the fact that, for the foreseeable future, Steves will be a net buyer of doorskins." J.A.__[Dkt.2663.18 n.9]. But they can hardly be faulted for not anticipating the court's novel and legally-erroneous redefinition of the market to exclude Steves' plant in assessing competition. *See infra* pp.49-53. If anything, their analysis confirms the district court erred.

48

Towanda vividly demonstrated that Steves' entry restores competition to pre-acquisition levels, further compelling Rule 60(b) relief.

### 2. The District Court Impermissibly Gerrymandered Steves' New Plant Out of the Relevant Market to Deny Rule 60(b) Relief.

Notwithstanding Steves' new plant (that it had represented it could not build) and the market's reaction to Steves' entry as an additional participant, the district court said there was still no change at all. Bizarrely, it rationalized that only two entities (JELD-WEN and Masonite) would be suppliers without divestiture and everything "remains the same" as in 2018. J.A.__[Dkt.2663.21]; *see also* J.A.__[Dkt.2663.16]; J.A.__[Dkt.2663.20] ("[W]ithout divestiture, the domestic market for doorskins will remain as it was at the time of trial.").

To reach its conclusion, the district court had to redefine the antitrust market that undergirded every finding to date (by the jury, district court, and this Court) encompassing all domestic "competitors who make and sell doorskins," J.A.__[Dkt.1784.110], to instead craft a new market limited to doorskin "supplier[s] *to the other Independents*," J.A.__[Dkt.2663.17]. It reasoned that, based on Steves' expectations for its increased future sales, Steves might not sell its doorskins to

49

independent doormakers. J.A.__[Dkt.2663.17] (speculating "Steves will be a net buyer of doorskins for years to come" and "will not be a supplier to the other Independents"). It did so despite the fact that, pre-acquisition, the three domestic doorskin manufacturers were all vertically integrated—and this Court had recognized that divesture itself could result in three vertically-integrated manufacturers (who might or might not have incentive to sell to independent doormakers). *Steves*, 988 F.3d at 724 ("[I]t's reasonable to expect that a third supplier—even one that's vertically integrated—will promote competition[.]").

Only by redefining the relevant market from all domestic doorskin manufacturers to a new market for "supplier[s] to the other Independents" (that speculatively excluded Steves' market entry), J.A.__[Dkt.2663.17], was the district court able to assert there had been no change. But *that* market was never evaluated by an expert, advocated by either party, presented to the jury, or proven at trial. The jury found JELD-WEN's acquisition of CMI would substantially lessen competition in the market for "doorskins used in the United States." *See* J.A.__[Dkt.1025.31] (jury instructions); J.A.__[Dkt.1022.1-2] (verdict). The domestic doorskin market considered by the jury included vertically-

50

integrated manufacturers, which supply doorskins for their own door-making.  Steves itself explained that the "relevant market" is "*interior molded doorskins used* in the United States, which captures sales to independents *and* 'sales' for internal use by the integrated door manufacturers."  J.A.___[Dkt.2209.5].  That is why, by acquiring CMI, JELD-WEN reduced the number of suppliers from three to two—even though each supplier was vertically integrated and used some of its doorskin output to support its own door production.  *See, e.g.*, J.A.__[Dkt.1784.111].

The district court erred when it denied Rule 60(b) relief by redefining the market to exclude Steves' new plant.  Switching up the relevant markets is no minor thing: As *Brown Shoe* explained, "[d]etermination of the relevant market is a *necessary predicate* to a finding of a violation of the Clayton Act."  370 U.S. at 324.  The effect on competition and appropriateness of remedies can be determined "*only in terms of the market affected.*"  *Id.*; *see FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) ("Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning."); *Stanley Works v. FTC*, 469 F.2d 498, 500 (2d Cir. 1972)

51

("[D]etermination of the relevant product and geographic markets is of critical significance[.]"). The district court instructed the jury extensively on how to define a market and tasked the jury with "decid[ing] whether … the acquisition of CMI by JELD-WEN substantially … lessen[ed] competition *in the relevant product and geographic markets*" precisely because the market definition is foundational. J.A.__[Dkt.1025.32]. Changing the relevant market for purposes of denying Rule 60(b) relief is as unprecedented as it is unprincipled.

The district court's suggestion that JELD-WEN would have the *same* incentive to foreclose the remaining independents, even with Steves as a new competitor, J.A.__[Dkt.2663.21-22], cannot be squared with market realities nor prior proceedings. The reality is that, vertically integrated or not, Steves' new manufacturing capacity changes the market. With its new plant, Steves will inject ███████ doorskins into the market, which—as the divestiture bidders understood—would necessarily affect JELD-WEN's ability to keep Towanda profitable. After all, if JELD-WEN keeps Towanda, it would need to rely on customers other than Steves—████████████████—to turn any profit at all. *See* J.A.__[Dkt.2661.33-35]. Regardless, this Court previously

52

dismissed the argument that a vertically-integrated competitor was irrelevant to assessing competition. *Steves*, 988 F.3d at 724. It was the loss of a vertically-integrated competitor that resulted in a duopoly in the first place. *Id.*

There is no legal nor economically rational basis for ignoring the change in the doorskin market arising from Steves' plant to deny Rule 60(b) relief. As Steves itself put it, ███████████████████ ████████████████████████████████████████████ ██████████████████████ With three manufacturers in the marketplace, competition is restored without the need for divestiture. Instead, the district court appeared motivated to complete divestiture not to "restore" competition but because of "JELD-WEN's past record." J.A.__[Dkt.2663.22]. That is legally impermissible punishment. *See du Pont*, 366 U.S. at 326. It is impermissible for good reason: As Steves' own expert explained, ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ In this case, changed circumstances

undercut the entire basis for the 2018 divestiture remedy, compelling Rule 60(b) relief and reversal of its denial.

## II.    THIS DIVESTITURE, TO WOODGRAIN, IS INEQUITABLE.

Independent of Rule 60(b) relief (which would vacate the 2018 divestiture remedy and moot the 2024 divestiture order entirely), the 2024 divestiture order requiring divestiture to Woodgrain should itself be reversed.  In its singular pursuit of completing this first-of-its-kind divestiture, the district court inverted the burden of proof while misapplying the balance-of-hardships and public-interest factors.  Under the facts as they now exist, no prospective divestiture can satisfy the *eBay* factors.  The latest divestiture order should thus be reversed.

### A.    Steves Bears the Burden of Proving That Divestiture to Woodgrain Is Equitable.

Before awarding injunctive relief, "the district court is duty bound to ensure that *the party seeking injunctive relief* has made the requisite showings."  *Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 190 (4th Cir. 2023); *accord eBay*, 547 U.S. at 391 (explaining that "a plaintiff seeking a permanent injunction must satisfy [the] four-factor [equitable] test before a court may grant such relief").  It follows that Steves—the party seeking this specific divestiture to Woodgrain—bears the burden of

54

proving that this divestiture is equitable. The district court impermissibly flipped that fundamental principle on its head based on a misunderstanding of this case's history and posture, along with the meaning of *Brown Shoe*.

In 2018, all agreed that Steves had to prove the equitable factors favored divestiture generally; the parties' dispute was over *when* Steves had to prove those factors and *what* Steves had to prove. JELD-WEN argued that Steves had to prove that divestiture to a *specific, identified buyer* was equitable "*before* [the district court] decid[ed] Steves' request for divestiture." J.A.__[Dkt.1784.99] (emphasis in original). Steves, on the other hand, argued that the district court could order "divestiture" as a remedy immediately and reserve questions about the "particulars" until *after* identifying a buyer. J.A.__[Dkt.1784.100]. This Court and the district court agreed with Steves. Consistent with the process articulated in *Brown Shoe*, both courts ruled that the district court could find a divestiture remedy was equitable (in the abstract) and then, after identifying a buyer, consider whether divestiture to that particular buyer was equitable. J.A.__[Dkt.1784.104-05]; *Steves*, 988 F.3d at 722, 724.

55

In reserving questions as to the particulars of divestiture, neither court suggested it was somehow reallocating the *burden of proving* that a particular divestiture to a particular buyer was ultimately equitable. The district court thus erred when, seven years later, it finally took up the reserved questions but flipped the burden as to who must prove an entitlement to relief. It repeatedly made clear that, even as to issues that could have been raised only once Woodgrain was selected to purchase Towanda, JELD-WEN had to "provide[] sufficient evidence or convincing arguments" that divestiture to Woodgrain was *in*equitable. J.A.__[Dkt.2661.17]; *see also, e.g.*, J.A.__[Dkt.2661.16] ("The Court holds that [JELD-WEN's] concerns lack sufficient evidence[.]"); J.A.__[Dkt.2661.39-40] ("JELD-WEN has not sufficiently established that Woodgrain's offered price … is unfair or unreasonable[.]"); J.A.__[Dkt.2661.32] ("JELD-WEN has failed to make a showing that Woodgrain acquiring Towanda would harm the public interest[.]"). That is exactly backwards—it was always *Steves'* burden to prove this divestiture *equitable*.

Although the district court did not clearly explain why it inverted the burden, to the extent it relied on *Brown Shoe* (or this Court's prior

56

discussion of that case), J.A.__[Dkt.2661.17-24], *Brown Shoe* provides no support.  It merely held that a decision requiring divestiture is sufficiently final to permit appellate review even if questions as to the ultimate buyer are reserved for later, 370 U.S. at 305-10; it said nothing about the burden of proof.  In that case, unlike here, the appellant disputed divestiture "on an 'all or nothing' basis," so deferring resolution of the reserved questions would not require "[r]epetitive judicial consideration of the same question in a single suit."  *Id.* at 309. Regardless, deciding the propriety of appellate jurisdiction in that step-one posture says nothing about the *burden* at step two, where additional facts remain to be proven.  Unsurprisingly, JELD-WEN is not aware of any decision following *Brown Shoe* that has suggested it flips the burden from the plaintiff to defendant at step two—until the decision below.

Tellingly, had this case not followed the two-step *Brown Shoe* framework, Steves unquestionably would have borne the burden of proving that *this* divestiture *to Woodgrain* satisfied all the equitable factors.  *See eBay*, 547 U.S. at 391; *Wudi Indus.*, 70 F.4th at 190.  The district court erred as a matter of law by shifting the burden from Steves to JELD-WEN for any part of that inquiry, requiring vacatur.

57

**B.** **The Balance of Hardships Does Not Favor This Divestiture.**

Regardless of who bears the burden, the record demonstrates that the 2024 divestiture order is inequitable because the balance of hardships does not favor divestiture to Woodgrain—particularly for only $115 million. The balance-of-hardships inquiry is now simple: As discussed above, Steves faces no proven risk of future harm. *See supra* pp.35-39. By contrast, the harm to JELD-WEN is substantial and growing. The district court, however, failed to balance the hardships and instead focused on considerations irrelevant to this independent equitable factor.

Today, there is nothing on Steves' side of the scale weighing in favor of this divestiture to Woodgrain—it simply faces no meaningful harm absent divestiture. At step-one of this litigation, the district court ruled (and this Court affirmed) that as the record stood in 2018, the balance of hardships favored divestiture as a general matter only because "Steves face[d] collapse without injunctive relief" and "[s]uch a significant possibility that a party w[ill] be driven out of business carries great weight when balancing hardships." *Steves*, 988 F.3d at 721. As discussed, however, there is no longer any proven "harm" on Steves' side of the scale. Irrespective of Rule 60(b) relief, for purposes of assessing

58

the equities of this new divestiture order (requiring *this* particular divestiture on *these* specific terms), there is nothing on Steves' side of the scale.

Meanwhile, the hardships to JELD-WEN from divestiture have ballooned. Even in 2018, this Court (and the district court) recognized that "divestiture would cost JELD-WEN a great deal financially and would reduce its doorskin output." *Id.*; *see also* J.A.__[Dkt.1784.89-96]. JELD-WEN still faced those harms from, among other things, the very "real" burden of "splitting up entities that have combined assets and operations after a merger," increased costs, the loss of production efficiencies, and the loss of two non-doorskin businesses that are housed at Towanda and "never posed any antitrust concerns." J.A.__[Dkt.1784.89-90, 94-95].

Critically, the divestiture process produced a diminished price that exacerbated JELD-WEN's hardships. The district court originally reasoned that "all of [JELD-WEN's] claimed hardships c[ould] be ameliorated" by ensuring a process that would "produce a reasonable purchase price." J.A.__[Dkt.1784.96]. But far from ameliorating JELD-WEN's hardships, Woodgrain's $115 million price did the opposite. That

59

price is less than ███████ of the first-round's ███████ recommended bid, and it is only about ██████ of Towanda's ████████ value. J.A.__[Dkt.2593-5¶¶36-38]. In other words, an objective analysis of the revenue and other cash flows Towanda will generate value for Woodgrain make it worth ██████ of the $115 million JELD-WEN received from Woodgrain. At a minimum, the reduced purchase price and disruption from the divestiture process itself on JELD-WEN's business place at least *some* additional harm on JELD-WEN's already hefty side of the hardship scale. The obvious result: JELD-WEN's significant harm outweighs Steves' nonexistent harm.

The district court avoided that conclusion by failing to balance the hardships. To evaluate the balance-of-hardships factor, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24; *accord eBay*, 547 U.S. at 391 ("A plaintiff must demonstrate … that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted[.]"). The district court, however, did not *balance* Steves' harm absent divestiture to

60

Woodgrain against JELD-WEN's harm from divestiture.  As a matter of law, it answered the wrong question.

Rather than balance the hardships, the court focused on side-points that carry little to no weight for this factor.  First, the court suggested that the hardship to JELD-WEN caused by the low price should be disregarded because JELD-WEN had violated the Clayton Act and divestiture would serve the "public purpose of protecting competition." J.A.__[Dkt.2661.39].  Second, the court fixated on whether Woodgrain's price was somehow fair or reasonable in a vacuum.  And it found that the price was reasonable, in part because the price was "then obtainable" at the end of a process marked by "a changed industry landscape due to Steves' new plant announcement," and JELD-WEN would receive more than it paid for Towanda.  J.A.__[Dkt.2661.45-46 & n.7].

That reasoning is wrong as a matter of law and fact.  To begin, whether divestiture would serve the "public purpose of protecting competition" conflates this equitable factor with the separate public-interest factor.  J.A.__[Dkt.2661.39].  Balancing the harms to the parties is a distinct inquiry from whether an equitable remedy is in the overall public interest.  *See eBay*, 547 U.S. at 391.  (In any event, considering the

61

harm to others cuts *against* this divestiture, not for it. *See infra* pp.64-68.)

Nor is it relevant to the balance of hardships to find that a defendant violated the law—once again, the district court injected a punitive rationale into its analysis. An "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course," *Winter*, 555 U.S. at 32, and it is "not the function of courts of equity to administer punishment," *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 717 n.14 (1974). The district court thus could not order divestiture to Woodgrain merely because JELD-WEN violated the Clayton Act or some members of the public might benefit from divestiture.

Even on its own terms the district court's analysis was flawed. It reasoned that JELD-WEN's expert did not consider that a forced sale would reduce the price bidders were willing to pay, and thus JELD-WEN failed to establish that Woodgrain's price was so low as to render divestiture inequitable. J.A.__[Dkt.2661.42-44]. But JELD-WEN's expert *did* consider the unique circumstances of this forced sale at length

(as the district court appears to acknowledge). *See* J.A.__[Dkt.2593-5¶26]; J.A.__[Dkt.2661.42].

Even assuming some degree of diminishment in the forced-sale price is acceptable, the magnitude of the difference between Woodgrain's purchase price and Towanda's actual value renders the purchase price inequitable under the district court's own framework. The record shows that the disparity is not substantially due to the forced sale, but to other acknowledged factors—notably, Steves' new plant. J.A.__[Dkt.2661.43-44]. After all, the first round's recommended bid of ▮▮▮▮▮ arose in a forced sale (but was thwarted by Steves). That was ▮▮▮▮▮ the amount for which JELD-WEN was forced to sell Towanda.

The district court was ultimately satisfied because Woodgrain's below-value price was the only one "then obtainable," and JELD-WEN would receive more than it paid for Towanda (not adjusted for inflation). *See* J.A.__[Dkt.2661.45-46 & n.7]. But businesses are not valued based on their historic purchase price because (among other things) companies like JELD-WEN invest additional money into a business to generate greater revenue and other cash flows in the future. *See* J.A.__[Dkt.2581-4¶10 n.8]. Concluding that a price is reasonable because it is the only

63

price then-available is circular, ignores the business's value, and risks transforming an equitable remedy into an unlawful punishment. *See du Pont*, 366 U.S. at 326; *California*, 495 U.S. at 292 n.24.

At a minimum, Woodgrain's price has not "ameliorated" JELD-WEN's harms. J.A.__[Dkt.1784.96]. It has instead added harm to JELD-WEN's side of the scale. Meanwhile, Steves' harm from going out of business has vanished. Thus, unlike in 2018 when divestiture was considered as a general matter, the balance of hardships today tips decidedly against *this* divestiture (and indeed, against any divestiture, given the indisputable effect of Steves' market entry). Had the district court balanced the hardships, it should have reached that conclusion.

## C. This Divestiture Is Not in the Public Interest.

The 2024 divestiture order is also inequitable because it will not serve the public interest. Rather, the record confirms that, given Steves' market entry, divestiture will affirmatively harm independent doormakers. The district court avoided that conclusion only by dodging the public-interest question.

With Steves' conversion from an independent doormaker into a vertically-integrated operation, ██████████████████████████

64

███████████████████████████████████  *See* J.A.__[Dkt.2457-

9¶15].  The record establishes, however, that  █████  will *not* benefit

from, but instead actually be harmed by, divestiture.

As  █████  attested:  ███████████████████████



It is no answer to say (as the district court did) "there is no evidence

that what is best for  █████  is best for the doorskin industry."

J.A.__[Dkt.2663.24 n.13].  █████  evidence was not  █████-specific.  It

identified concerns about the industry-wide effects of divestiture.  (And

if nothing else, Steves did not carry *its burden* to overcome  █████

evidence.)

JELD-WEN's antitrust expert further demonstrated why an independent Towanda plant would not serve the public interest: freight costs and production costs will both increase with divestiture. For freight costs, whereas JELD-WEN has a nationwide network of doorskin plants that allows it to minimize shipping costs by minimizing the distance a doorskin must travel between a plant and customer, a Woodgrain-owned Towanda plant does not. J.A.__[Dkt.2457-19¶¶52-54]. ████, for example, ██████████████████████████

█████████████████████████████████

██████████████████████████. J.A.__[Dkt.2581-3¶37].[5]

███████████████████████████████

████████████████████████████████

██████████████████████ J.A.__[Dkt.2457-19¶¶55-58].

Because economic principles dictate that at least some of these costs are passed through to customers (if not directly paid by them), independents

---

[5] The district court criticized JELD-WEN's expert for failing to "provide an economic analysis of how he arrived at that conclusion." J.A.__[Dkt.2661.28 n.3]. But the expert explained that he relied on JELD-WEN data and ████████████████████████████ ████████████████████████████████ J.A.__[Dkt.2581-3¶¶33-37].

will face higher costs following divestiture—as ▇▇▇▇ understood. J.A.__[Dkt.2457-19¶¶53-54, 63].

Especially where, as discussed, *supra* pp.35-53, divestiture is not required to ensure Steves' survival nor restore a third manufacturer in a properly defined market, the harms to third parties from these inefficiencies should have been dispositive. Indeed, "[d]irect effects on innocent third parties have frequently grounded courts' denials of injunctions." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017). Steves—which should have borne the burden—did not (and could not) show that independents *would benefit* rather than suffer from increased freight and production costs.

The district court got the public-interest determination wrong by improperly reframing the relevant legal question. Rather than consider whether this divestiture *to Woodgrain from JELD-WEN* was in the public interest, it considered only "whether Woodgrain could not efficiently operate Towanda to the same extent that a *different acquirer* could operate Towanda." J.A.__[Dkt.2661.29] (emphasis in original). In the court's view, assessing how Woodgrain would operate Towanda *compared to JELD-WEN* was an issue going to whether "JELD-WEN should not be

forced to divest Towanda in the first instance"—and was therefore off-limits. J.A.__[Dkt.2661.29]. But in refusing to weigh the relative harms and benefits *today* from a Towanda owned by Woodgrain versus JELD-WEN, the court blinded itself to the relevant legal inquiry. There is no legal basis for the district court's truncated assessment of the public interest.

The relevant legal question is whether *this* divestiture is actually in the public interest. That requires a comparison between operation under Woodgrain versus under JELD-WEN. ███████ evidence is highly relevant to that inquiry, and is why this divestiture at this juncture (with a third doorskin manufacturing competitor entering the market without divestiture) is inequitable. The district court essentially reasoned that transferring Towanda to Woodgrain was the least bad option among alternatives, all of which could be worse than the status quo. That approach is inconsistent with this Court's warning in the first appeal that "the district court may have to revisit its ruling" *altogether* if there were no "satisfactory buyer." *Steves*, 988 F.3d at 724.

Instead, the district court's reasoning became a self-fulfilling prophecy: because "Woodgrain was the only serious bidder who remained

by the end of the bidding process," Woodgrain was the *only* available alternative and divestiture thus must be equitable.  J.A.__[Dkt.2661.29]. That is no way to decide whether this divestiture is in the public interest. The 2024 divestiture order is inequitable and cannot stand.

## CONCLUSION

The Court should reverse both decisions of the district court.

Dated: May 2, 2025

Respectfully submitted,

*/s/ John C. O'Quinn*

BRIAN C. RIOPELLE
MCGUIREWOODS LLP
800 E. Canal Street
Richmond, VA 23219
(804) 775-1084
briopelle@mcguirewoods.com

JOHN C. O'QUINN
    *Counsel of Record*
CRAIG S. PRIMIS
MATTHEW S. OWEN
MEGAN MCGLYNN
CAROLINE MILNER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000
john.oquinn@kirkland.com

*Counsel for Defendant-Appellant JELD-WEN, Inc.*

69

## STATEMENT REGARDING ORAL ARGUMENT

JELD-WEN respectfully requests oral argument. This appeal arises from the first-ever divestiture ordered in a private antitrust suit. It raises significant questions of first impression about the validity of injunctive relief in the absence of irreparable harm and the proper legal framework for evaluating a request for equitable relief. JELD-WEN submits that oral argument would assist the Court in resolving these complex issues and in reviewing this case's voluminous record, which spans nine years and thousands of filings.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,823 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

May 2, 2025

*/s/ John C. O'Quinn*
John C. O'Quinn

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing brief has been served via email and the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on May 2, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ John C. O'Quinn*
John C. O'Quinn