No. 25-1127

IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

STEVES AND SONS, INC.,
*Plaintiff-Appellee,*

and

WG TOWANDA LLC; WOODGRAIN, INC.,
*Intervenors-Appellees,*

v.

JELD-WEN, INC.,
*Defendant-Appellant,*

and

JOHN G. PIERCE,
*Intervenor.*

*On Appeal from Orders of the United States District Court for the Eastern District of Virginia at Richmond, Case No. 3:16-cv-00545, The Hon. Robert E. Payne, United States District Judge*

**REDACTED RESPONSE BRIEF OF APPELLEES**

Anthony P. Badaracco
DORSEY & WHITNEY LLP
51 West 52nd Street, 9th Floor
New York, New York 10019
(212) 415-9200
badaracco.anthony@dorsey.com

*Attorneys for Intervenors-Appellees
WG Towanda LLC & Woodgrain Inc.*

Benjamin J. Horwich
Rebecca L. Sciarrino
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Ben.Horwich@mto.com

*Attorneys for Plaintiff-Appellee
Steves and Sons, Inc.*

*Additional counsel listed on inside cover*

Lewis F. Powell III
Maya M. Eckstein
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200

Marvin G. Pipkin
PIPKIN LAW LLP
10001 Reunion Place, Suite 640
San Antonio, Texas 78216
(210) 731-6495

Glenn D. Pomerantz
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100

Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 220-1100

*Attorneys for Plaintiff-Appellee Steves and Sons, Inc.*

Michael A. Lindsay
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600

*Attorneys for Intervenors-Appellees*
*WG Towanda LLC & Woodgrain Inc.*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Steves and Sons, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Steves and Sons, Inc. is not aware of any publicly held corporation that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, or other profit-sharing agreement, insurance, or indemnity agreement.

The sole member of Intervenor-Appellee WG Towanda LLC is Intervenor-Appellee Woodgrain Inc. Woodgrain Inc. has no parent corporation, and no publicly held corporation owns more than 10% of its stock. Woodgrain Inc. and WG Towanda LLC are not aware of any publicly held corporation that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, or other profit-sharing agreement, insurance, or indemnity agreement.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................... 1

STATEMENT OF THE ISSUES .............................................. 4

STATEMENT OF THE CASE ................................................. 4

    A.    JELD-WEN Acquires Towanda and Wields Its New Market Power Against Steves ................................ 4

    B.    A Jury Finds JELD-WEN Violated the Clayton Act, and This Court Affirms that Divestiture Is Proper ............... 6

    C.    Aided by a Special Master, the District Court Carries Out Divestiture .................................................. 8

    D.    The District Court Orders Towanda Divested to Woodgrain ........................................................ 12

    E.    Divestiture Closes ............................................... 18

SUMMARY OF ARGUMENT ............................................... 18

STANDARD OF REVIEW .................................................... 23

ARGUMENT ...................................................................... 25

I.    The District Court Did Not Abuse Its Discretion in Denying JELD-WEN's Rule 60(b)(5) Motion ................................ 25

    A.    JELD-WEN Did Not Meet the Standard for Rule 60(b)(5) Relief ..................................................... 26

        1.    Rule 60(b)(5) Is an Extraordinary Remedy that Allows Relief from Judgment Only Where a Significant Change in Circumstances Renders Continued Enforcement Inequitable .......................... 26

        2.    JELD-WEN Failed to Make the Required Showing Under Rule 60(b)(5) ...................................... 29

            (a)    Even with Athens Fully Online in Future Years, Steves Will Remain a Net Buyer of Doorskins ............................................ 29

(b) Vacating the Divestiture Decree Would Not Have Been in the Public Interest Because the Purpose of That Decree Had Not Been Achieved ............................................................. 32

B. JELD-WEN's Arguments in Favor of Rule 60(b)(5) Relief Are Mistaken ................................................ 35

1. JELD-WEN's Irreparable Harm Argument Is Wrong on the Law and the Facts ................................. 36

2. JELD-WEN Is Wrong that Competition Would Have Been Restored Absent Divestiture ..................... 43

II. The District Court Did Not Abuse Its Discretion in Adopting the Special Master's Divestiture Report & Recommendation and Overruling JELD-WEN's Objections ...................................... 45

A. The District Court Placed No Improper Burden on JELD-WEN ......................................................... 46

B. JELD-WEN's Balance-of-Hardships Argument Fails .......... 51

1. The District Court Was Not Permitted to Reweigh the Balance of Hardships .............................. 52

2. Absent Divestiture, Steves Would Have Continued to Face Harm .............................................. 54

3. The District Court Correctly Found that Woodgrain Paid a Fair Price for Towanda ................. 54

C. JELD-WEN's Argument that Divestiture Was Not in the Public Interest Fails ....................................... 60

1. JELD-WEN's Public-Interest Evidence Addressed the Wrong Question ...................................... 61

2. The District Court Correctly Rejected JELD-WEN' Public Interest Evidence on Its Own Terms ..... 62

3. The District Court Properly Addressed Whether Woodgrain's Ownership of Towanda Would Serve the Public Interest ........................................................ 65

III. JELD-WEN Fails to Contend with the Undesirable Practical Consequences of Accepting Its Arguments ................................... 66

A. Absent Affirmance, the District Court Would Need to Address or Revisit Unresolved Issues in the First Instance ........................................................ 67

B. Absent Affirmance, Remand Would Be Necessary to Allow the District Court to Determine the Equitable Path Forward ........................................................ 70

CONCLUSION ........................................................ 73

STATEMENT REGARDING ORAL ARGUMENT ................................ 74

CERTIFICATE OF COMPLIANCE ........................................................ 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BFP v. Resol. Tr. Corp.*, 511 U.S. 531 (1994) ......................................... 58

*BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612 (2025) ................. 24, 35

*Browder v. Dir., Dep't of Corr.*, 434 U.S. 257 (1978) .............................. 24

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................. *passim*

*Brown v. Davenport*, 596 U.S. 118 (2022) ............................................... 49

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ................... 3, 4, 24, 27

*Board of Educ. v. Dowell*, 498 U.S. 237 (1991) ................................. 33, 37

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ....................... 46

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ........................... 68

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ............................ 63

*FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ....................... 63

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ............................ 63

*Goldfarb v. Mayor & City Council of Baltimore*,
   791 F.3d 500 (4th Cir. 2015) ............................................................... 69

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021) .............................................................................. 50

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ............................................... 23

*Government of Province of Manitoba v. Zinke*,
   849 F.3d 1111 (D.C. Cir. 2017) ........................................................... 37

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017) .......... 51

*Guzman v. Allstate Assurance Co.*,
   2023 WL 6807054 (5th Cir. Oct. 16, 2023) ......................................... 51

*Horne v. Flores*, 557 U.S. 433 (2009) .................................... 26, 27, 32, 37

*Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995) ........ 26

*Matthews v. Rodgers*, 284 U.S. 521 (1932) .............................................. 40

*Moses v. Joynor*, 815 F.3d 163 (4th Cir. 2016) ....................................... 68

*Motorola Credit Corp. v. Uzan*, 561 F.3d 123 (2d Cir. 2009) .................. 68

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
Operating Co.*, 22 F.3d 546 (4th Cir. 1994) ......................................... 41

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ..................................... 41

*PBM Prods., LLC v. Mead Johnson & Co.*, 2010 WL 957756
(E.D. Va. Mar. 12, 2010), *aff'd*, 639 F.3d 111 (4th Cir. 2011) ............ 40

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ......................................................... 24, 26, 32, 38

*Solis v. Malkani*, 638 F.3d 269 (4th Cir. 2011) ...................................... 24

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.,
Ltd.*, 778 F.3d 775 (9th Cir. 2015) ....................................................... 63

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ..................................................... *passim*

*Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642 (1961)................................... 38

*Thompson v. HUD*, 404 F.3d 821 (4th Cir. 2005).................................... 26

*Twelve John Does v. District of Columbia*,
861 F.2d 295 (D.C. Cir. 1988) ............................................................ 43

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) ........... 27

*United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006) .......................... 64

**Page(s)**

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ............................ 34, 39

*United States v. United Shoe Corp.*, 391 U.S. 244 (1968) .............. *passim*

*United States v. Welsh*, 879 F.3d 530 (4th Cir. 2018) ................. 26, 31, 68

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................ 46

**Statute and Rules**

Clayton Antitrust Act § 7, 15 U.S.C. § 18 ...................................... *passim*

Fed. R. Civ. P.:
    Rule 53(f) ............................................................... 16, 46, 48
    Rule 60(b) ...................................................................... *passim*
    Rule 60(b)(5) ................................................................. *passim*
    Rule 60(b)(6) ......................................................................... 35
    Rule 60(c) .............................................................................. 68
    Rule 60(c)(1) ........................................................................ 10
    Rule 61 .................................................................................. 51

Fed. R. Evid.:
    Rule 701 ................................................................................ 64
    Rule 702 ................................................................................ 64

**Other Authorities**

11 Wright & Miller's Federal Practice & Procedure:
    § 2886 (3d ed.) .................................................................... 51
    § 2888 (3d ed.) .................................................................... 51

12 Moore's Federal Practice:
    § 60.22[5] (3d ed. 2008) ...................................................... 69
    § 60.47(2)(c) (3d ed. 2025) .................................................. 28

# INTRODUCTION

Defendant-appellant JELD-WEN, Inc. violated the antitrust laws when it acquired a competitor, Craftmaster Manufacturing, Inc. ("CMI") and its Towanda, Pennsylvania factory ("Towanda"). After nearly a decade of litigation, Towanda has been divested to a buyer that the District Court concluded—and a special master, court-appointed antitrust counsel, and independent economics and investment experts all agreed—would restore lost competition to the market: intervenors-appellees WG Towanda LLC and Woodgrain Inc. ("Woodgrain").

The ink has dried: Woodgrain now owns and operates Towanda. Once again, three manufacturers are able to supply independent doormakers—such as plaintiff-appellee Steves and Sons, Inc. ("Steves")—with the doorskins needed to make finished interior doors. Meanwhile, Steves continues construction on its anticipated doorskin factory in Athens, Georgia ("Athens"). But even if Athens meets Steves' full ambitions when it becomes operational, it would supply only a fraction of Steves' needs, and, as the District Court found, Steves would remain a net buyer of doorskins, including those produced at Towanda.

This litigation presented what this Court called the "poster child for divestiture." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 724 (4th Cir. 2021). By all measures except its duration, the litigation was a success, with a completed divestiture remedy exactly proportional to JELD-WEN's violation. But JELD-WEN now asks this Court to vacate the divestiture decree, return Towanda to JELD-WEN, and reinstall the very duopoly that a jury found violated Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18. To what end? Doing so would foist an unlawful merger back on the market, forcing Steves and other door manufacturers back to pleading with JELD-WEN and Masonite Corporation ("Masonite") for doorskins—the same two suppliers that the District Court, and this Court, already held were insufficient. And so the District Court would be back at square one, left to fashion some new remedy to control the ongoing effects of JELD-WEN's indisputably unlawful conduct.

JELD-WEN's arguments for that misguided outcome lack factual or legal support. In the two decisions below, the District Court—with the benefit of nearly a decade managing this case and deep familiarity with the record—rejected JELD-WEN's objections to Woodgrain as the

divestiture buyer and JELD-WEN's eleventh-hour bid to vacate divestiture altogether under Federal Rule of Civil Procedure 60(b)(5). JELD-WEN would now ignore the District Court's factual findings relevant to both decisions. It persists in re-raising issues that, if they were ever relevant, mattered in its prior appeal (over whether divestiture was appropriate), not today (when the question is whether Woodgrain was a suitable buyer). And JELD-WEN fails even to cite—much less apply—the Supreme Court's leading precedent on relief from an antitrust judgment, which "may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968). Because the "purposes of the litigation" to restore the competition lost through JELD-WEN's illegal merger had not been achieved—for example, Steves itself would remain a net buyer of doorskins, exposed to an unremedied loss of competition—the District Court properly proceeded with the divestiture.

JELD-WEN never wanted divestiture, but that is "the remedy best suited to redress the ills of an anticompetitive merger." *California*

*v. Am. Stores Co.*, 495 U.S. 271, 285 (1990). Divestiture to Woodgrain is complete, fulfilling the decree that this Court affirmed to "restore competition in the doorskin market." *Steves*, 988 F.3d at 720. The orders below should be affirmed and this matter be put to rest.

## STATEMENT OF THE ISSUES

**1.** Whether the District Court exercised sound discretion in denying JELD-WEN's motion seeking the extraordinary remedy of relief from judgment under Rule 60(b)(5), where JELD-WEN failed to show that significantly changed circumstances rendered enforcement of the underlying divestiture decree detrimental to the public interest.

**2.** Whether the District Court exercised sound discretion in adopting the Special Master's Report and Recommendation recommending divestiture to Woodgrain, where Woodgrain demonstrated the technical and industry expertise to restore competition and offered a fair price.

## STATEMENT OF THE CASE

### A. JELD-WEN Acquires Towanda and Wields Its New Market Power Against Steves

Founded in 1866 in San Antonio, Texas, Steves and Sons is managed by the fifth and sixth generations of the Steves family.

JA__[1784.37]*.[1] It makes and sells interior molded doors—the standard type used in residential construction. *See Steves*, 988 F.3d at 706. Such doors typically are made with a wooden frame and filling material, to which molded "doorskins" are glued, forming the front and back of the door. *Id.* at 699; JA__[1784.3]*. The finished product resembles a solid wood door but is lighter and can be made and shipped at lower cost. JA__[1784.3]*. Steves has never made doorskins; it has always purchased them from doorskin manufacturers. JA__[1784.3]*; *Steves*, 988 F.3d at 699.

In 2012, there were three U.S. doorskin manufacturers—JELD-WEN, Masonite, and CMI. Each was vertically integrated, meaning that each produced doorskins and used those doorskins internally to make its own finished doors. But each also made more doorskins than it used internally. The other door manufacturers at the time—known as "Independents," including Steves—were not vertically integrated and purchased those excess doorskins (a necessary input for their manufacturing process) from JELD-WEN, Masonite, or CMI. *Steves*, 988 F.3d at 699.

---

[1] Citations with an asterisk reference the District Court's orders.

In October 2012, JELD-WEN purchased all of CMI's assets for ██

██. JA__[2661.3]*. Among those assets was Towanda, which

produced doorskins (and other products). JA__[2661.3]*. Before and

after that acquisition, Steves was a JELD-WEN customer.

JA__[2661.3]*. Following JELD-WEN's acquisition, Steves faced novel

problems as a customer of JELD-WEN, including increased prices,

reduced quality, and a stingy reimbursement policy for faulty doorskins.

*Steves*, 988 F.3d at 700-01. Yet Steves could not change doorskin

suppliers: The only other U.S. doorskin supplier following JELD-

WEN's acquisition of CMI was Masonite, which refused to sell doorskins

to Independents (except on an inflated spot-sale basis). *Id.* at 701-02.

### B. A Jury Finds JELD-WEN Violated the Clayton Act, and This Court Affirms that Divestiture Is Proper

Steves sued JELD-WEN in 2016. As relevant here, Steves alleged

that JELD-WEN's acquisition of CMI violated Section 7 of the Clayton

Antitrust Act, 15 U.S.C. § 18. *Steves*, 988 F.3d at 702. Steves sought

damages for its past overpayments and prospective injunctive relief,

including divestiture of Towanda. *Id.* at 703; JA__[2661.4]*.

In 2018, a jury agreed with Steves, finding that the 2012 merger

substantially reduced competition in the doorskin market. *Steves*, 988

F.3d at 704-05.  Among other relief, the jury awarded past damages to Steves on the antitrust claims, which were trebled to $36.4 million.  *Id.*

The District Court then held a five-day hearing on prospective equitable remedies.  It determined that divestiture of Towanda was the appropriate way to restore the competition lost due to JELD-WEN's unlawful acquisition of CMI.  *Steves*, 988 F.3d at 706-07.  The Court adopted the approach approved by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), under which divestiture proceeds in two steps.  *Steves*, 988 F.3d 722.  First, the divestiture decree (addressing *whether* Towanda should be divested) would be subject to immediate appellate review.  Second, assuming this Court affirmed, the District Court would address on remand the particulars of *how* and *to whom* Towanda would be divested.  JA__[2661.6-7]*.

Describing the case as "a poster child for divestiture," this Court affirmed the divestiture decree in full.  It concluded that "the record supports the district court's findings as to each of the equitable factors." *Steves*, 988 F.3d at 719-24.  This Court also affirmed, over JELD-WEN's objection, the two-step *Brown Shoe* approach.  *Id.* at 722.  As this Court recognized, a court could "assess the public interest…without having

found a buyer." *Id.* And because "[p]otential buyers may hesitate to place bids while a lengthy appeal looms," "[d]elaying the auction until this appeal wraps up will attract more buyers and thus serve the public interest." *Id.*

## C. Aided by a Special Master, the District Court Carries Out Divestiture

On remand, the parties, the District Court, and the Special Master (a retired district judge) worked to ensure Towanda's sale to an entity capable of accomplishing the goals announced by this Court.

**1.** The process began in 2021 with the Special Master and his advisors "solicit[ing] bids from dozens of industry participants and financial investors." JA__[2661.9]*. The final first-round bids ranged from ████████████████. JA__[2661.9]*. ████████████ was one of those bidders, and, at that time, JELD-WEN acknowledged that ████████ was an "acceptable choice[] for the divestiture of Towanda." JA__[2222.25].

The Special Master recommended ████████████████████████ bid. JA__[2661.9]*. Steves objected, focusing on the Special Master's analysis of ████████████████████. *See* JA__[2209]. Shortly

thereafter, ████████ withdrew its bid, and the first round ended without a buyer.  JA__[2661.9]*.

The Special Master reopened bidding in 2022.  JA__[2661.10]*. The second round attracted dozens of bidders, but only two completed their due diligence: ████ and ██████.  JA__[2661.9-10]*.  The Special Master initially recommended a sale to █████, and "[s]erious efforts were made to decide the particulars of a deal."  JA__[2661.10]*. JELD-WEN, however, objected to aspects of divesture to █████, including ██████ bid (even though its ████████ bid was the highest submitted).  JA__[2661.10]*; JA__[2551-1.11].  JELD-WEN rejected ██████ offer to enter into an exclusive negotiation posture, and the Special Master reengaged ██████.  JA__[2661.10-11]*.  But ████████ soon withdrew.  JA__[2661.11]*.

The third and final bidding round began in early 2024, eliciting bids from ████████████.  JA__[2661.12]*.  Woodgrain bid $115 million, and "[t]he Special Master focused on Woodgrain as the best potential bidder."  JA__[2661.12]*.  JELD-WEN and Woodgrain then spent "months negotiating, and completing, various ancillary

agreements and a tentative Asset Purchase Agreement."
JA__[2661.12]*.

JELD-WEN never contested the fairness of the process that the Special Master ran.  *See* JA__[2480.30:2-6].

**2.**     On May 1, 2024, late in the third round, JELD-WEN moved under Rule 60(b)(5) to "vacate all orders requiring JELD-WEN to divest…Towanda." JA__[2456.1].  JELD-WEN argued that the District Court should vacate the divestiture decree because, in JELD-WEN's view, there had been a "significant development since entry of [that] order:  Steves' announcement that it is building its own doorskins plant." JA__[2457.1].

Steves responded even if that plant achieves full production capacity, it would not supply Steves' full needs, so Steves would remain a net buyer of doorskins, exposed to JELD-WEN's exercise of power it gained when it acquired Towanda.  Moreover, although Rule 60(b)(5) motions must be filed "within a reasonable time," Fed. R. Civ. P. 60(c)(1), JELD-WEN's motion came well over two years after Steves had announced its plans:  During the *first* round of bidding, Steves advised JELD-WEN and the District Court that it had purchased a facility in

Athens, Georgia where it aimed to build a doorskin plant.
JA__[2209.14-15]; *see* JA__[2227.7-8]. And despite the parties' practice
of filing all divestiture-related pleadings under seal, JELD-WEN filed
its Rule 60(b)(5) motion on the public docket and, the same day, made a
public and wholly discretionary SEC filing announcing that JELD-WEN
was seeking vacatur of divestiture. JA__[2456]; *see* JA__[2464.14].
Both actions were widely reported, JA__[2464.15], and the District
Court later noted that JELD-WEN's motion "certainly had an adverse
effect on the bidding process," JA__[2663.13]*.

    **3.**    The Special Master submitted a Report and
Recommendation ("R&R") recommending Woodgrain as the purchaser
of Towanda. He relied on antitrust counsel (Venable), an investment
bank (KeyBanc), and economists (NERA). JA__[2661.13]*. He
recommended Woodgrain because, among other reasons, Woodgrain had
the "business acumen, experience, and financial ability to successfully
operate the Towanda facility." JA__[2551-1.30]. Woodgrain would be
able to "successfully operate" Towanda and "restore competition in the
doorskins market without raising horizontal or significant vertical
competitive concerns." JA__[2551-1.30-31] (quotation marks omitted).

Notably, Woodgrain was quite familiar with Towanda, having been a part-owner of the facility between 2002 and 2012 (before JELD-WEN's acquisition of CMI).  JA__[2661.14]*.

The Special Master addressed whether Woodgrain's offer was sufficient to ensure "to the extent reasonably possible" that JELD-WEN receive a "fair price for Towanda."  JA__[2661.14]* (quoting JA__[1784.148]*).  The R&R concluded, based on the Special Master's experience and KeyBanc's analysis, that "Woodgrain's bid is within a *reasonable range* of what the market is currently commanding under the unique circumstances of this divestiture."  JA__[2661.14]* (quoting JA__[2551-1.33]) (emphasis added).

JELD-WEN objected to the R&R.  JA__[2593].

## D. The District Court Orders Towanda Divested to Woodgrain

The District Court denied JELD-WEN's Rule 60(b)(5) motion and adopted the R&R in separate, detailed orders.

1. In denying JELD-WEN's Rule 60(b)(5) motion, the District Court acknowledged, without resolving, Steves' argument that the motion was untimely.  JA__[2663.13]*.  There was "much to be said in favor" of that argument because JELD-WEN's motion was filed "well

after it became known that Steves disclosed plans to build its own doorskins plant." JA__[2663.13]*.

The District Court resolved on the merits JELD-WEN's contention that "changed market conditions" made divestiture "contrary to the public interest." JA__[2663.16]* (capitalization omitted). JELD-WEN contended that Steves' anticipated doorskin plant would create "three doorskin suppliers in the domestic market," so "the number of suppliers will be the same when Steves opens its new plant as it was before JELD-WEN unlawfully acquired CMI in 2012." JA__[2663.16]*. That argument failed because there was no "changed market." "[U]nrebutted" evidence showed that, even if "all goes well" and "Steves does not experience the many difficulties that can significantly delay reaching production capacity," Athens would not fulfill Steves' doorskin needs. JA__[2663.17]*. Steves would remain "a net buyer of doorskins" and would "not be a supplier to the other Independents." JA__[2663.17]*.

The District Court found in the alternative that JELD-WEN had not shown that divestiture was contrary to the public interest. The evidence (including expert analyses) rebutted JELD-WEN's contention

that it could no longer foreclose Independents profitably—that is, much as at the time of trial, absent divestiture, JELD-WEN would still have the market power and incentive to "kill off" its competitors in the finished door market by withholding doorskins from them. JA__[2663.20-22]*.

The District Court next rejected JELD-WEN's contention that it could operate Towanda with "greater efficiencies" than Woodgrain (thereby, JELD-WEN claimed, benefiting the public with lower prices). The jury had considered and rejected that same argument, and it was unsupported by the record. JA__[2663.22-24]*.

Next, the District Court rejected JELD-WEN's argument that the balance of hardships now disfavored divestiture. That argument "boils down to the contention that the price that Woodgrain is prepared to pay for Towanda…is too small." JA__[2663.25]*. But, the Court reasoned, $115 million was not "unreasonable or unfair" because it far exceeded what JELD-WEN had paid for Towanda, "JELD-WEN has profited more than ▮▮▮▮▮▮▮▮" from Towanda since unlawfully acquiring it, and "the transaction is a forced sale and not one between a willing buyer and willing seller." JA__[2663.26]*.

Finally, the District Court rejected JELD-WEN's argument that, because divestiture was now not the only way to keep Steves from going out of business, Steves "no longer face[d] a threat of irreparable harm." JA__[2663.28-29]*. The Court reiterated that, even if Athens reached full capacity, "Steves will be a net buyer of doorskins" and so, just as before, be "exposed to competitive conditions as a buyer" and "forced to buy doorskins from JELD-WEN or Masonite." JA__[2663.29]*. But, because Masonite sells only on a spot-sale basis, "absent divestiture, JELD-WEN w[ould] continue to possess the market power that animated the jury's verdict" and would "continue to have[] an incentive to foreclose Steves and the Independents." JA__[2663.29-30]*. Accordingly, without divestiture, JELD-WEN would "retain[] the power and incentive to adversely affect Steves in serious ways by depriving it of the ability to meet its existing customer demand or to compete with JELD-WEN and others for new business." JA__[2663.30]*. The Court illustrated its point with evidence that Steves recently had been receiving an unprecedented number of defective doorskins from Towanda under JELD-WEN's ownership, explaining that the resulting

reputational harm and portended loss of goodwill were quintessential irreparable harm.  JA__[2663.30-31]*.

The District Court added that JELD-WEN's narrow focus on Steves' survival ignored the remedial posture:  This Court's affirmance of divestiture rested on the Clayton Act's "authoriz[ation of] injunctive relief in private suits 'not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws'—i.e., protecting competition."  JA__[2663.32]* (quoting *Steves*, 988 F.3d at 720). Divestiture remained the appropriate remedy because, unlike a conduct remedy, divestiture would promote and protect competition, while avoiding excessive judicial entanglement in the market. JA__[2663.33]*.

**2.**     The District Court overruled JELD-WEN's objections and "accept[ed] and adopt[ed]" the R&R, citing Federal Rule of Civil Procedure 53(f).  JA__[2661.55-56]*.

Many objections "rehashe[d] the arguments" from JELD-WEN's Rule 60(b)(5) motion, including the argument that divestiture was no longer equitable or in the public interest because of the anticipated Athens plant.  JA__[2661.15-16]*.  The District Court recognized such

arguments as a "collateral attack" on divestiture itself and held that considering such arguments in the objections posture was "procedurally improper under the *Brown Shoe* approach," since the question of *whether* Towanda should be divested was already settled. JA__[2661.15-16, 18]*.

The District Court considered and overruled what remained of JELD-WEN's objections: challenges to the propriety of Woodgrain as a buyer and the purchase price offered. After detailing the evidence, the Court found that JELD-WEN's concerns "lack[ed] sufficient evidence to reject the Special Master's R&R, and, instead, that the R&R sufficiently demonstrates that Woodgrain's acquisition of Towanda will likely restore competition to the U.S. doorskin market in accord with" the divestiture decree. JA__[2661.16]*; *see* JA__[2661.24-37]*. The Court similarly found that JELD-WEN had, by contrast, not provided "sufficient evidence or convincing arguments that demonstrate that the price Woodgrain intends to pay for Towanda is unfair or unreasonable." JA__[2661.17]*; *see* JA__[2661.37-47]*.

### E. Divestiture Closes

Initially, JELD-WEN asserted that divestiture should not close until after it exhausted its appellate rights. JA__[2630.3]. But JELD-WEN reversed course on December 10, 2024, informing the District Court that JELD-WEN "agree[d] to close the transaction" and "will not seek to stay the closing." JA__[2651.1-2]. Woodgrain and JELD-WEN then carried out the divestiture, formally closing it on January 17, 2025, whereupon Woodgrain assumed ownership and operation of Towanda. *See* JA__[2680]*.

## SUMMARY OF ARGUMENT

**I.** The District Court exercised sound discretion in denying JELD-WEN's Rule 60(b)(5) motion to vacate the divestiture decree.

**A.** JELD-WEN's contrary argument misconceives the appropriate standard for such motions; accepting JELD-WEN's view would entail relitigating the divestiture decree anew under the traditional four-factor test for equitable relief. That would undermine Rule 60(b)'s respect for finality of judgments. Rule 60(b)(5) relief is proper only when the movant shows significantly changed

circumstances that render continued enforcement of a judgment detrimental to the public interest.

JELD-WEN failed to carry that heavy burden. An antitrust decree stands unless the purposes of the injunction have been achieved. Because Steves' Athens plant will (if operational) supply only a fraction of Steves' doorskin needs, Steves will still be a net buyer of doorskins, not JELD-WEN's competitor in the sale of doorskins. Steves and the other Independents continue to need to purchase doorskins; accordingly, absent divestiture, JELD-WEN would have continued to have the power and incentive to foreclose its rivals in the door market—much the same as it did when the jury found that JELD-WEN's acquisition of CMI violated the Clayton Act. With the purposes of the divestiture decree unfulfilled, the District Court correctly refused to vacate it.

**B.** JELD-WEN's failure to argue under the appropriate standard of relief disposes of its Rule 60(b)(5) arguments. Regardless, JELD-WEN's arguments are incorrect on their own terms.

The District Court correctly rejected JELD-WEN's irreparable harm argument because Steves would indeed have faced irreparable harm without divestiture: JELD-WEN would have continued to

exercise unlawfully obtained market power, putting Steves to the necessity of endless suits for damages and saddling Steves with defective doorskins that threatened its reputation and goodwill—all of which are classic irreparable harms.

JELD-WEN is likewise wrong that competition would have been restored without divestiture. JELD-WEN again incorrectly asserts that Steves' Athens plant would bring a third competitor into the market. Because Steves will remain a net buyer of doorskins even if Athens reaches full capacity years in the future, the District Court correctly recognized that divestiture was needed to restore competition.

**II.** The District Court correctly approved the sale of Towanda to Woodgrain and overruled JELD-WEN's objections to the Special Master's R&R. JELD-WEN's contrary argument is incorrectly framed (again) as if Steves were seeking new equitable relief and bore the burden of satisfying the four equitable relief factors. But Steves was not *seeking* divestiture—divestiture had already been ordered, and this Court had already affirmed the decree ordering that relief, at step one of the *Brown Shoe* process. What was left at step two was arranging the particulars of selling Towanda to a specific buyer and confirming

that those particulars served the public interest and reflected a fair price.

**A.** In reviewing the R&R and approving the sale to Woodgrain, the District Court drew on the Special Master's work, amassed a record, and held a hearing. It concluded that Woodgrain was an appropriate buyer and offered JELD-WEN a fair price. In arguing that the District Court placed an improper burden on JELD-WEN to disprove the appropriateness of the sale, JELD-WEN cites snippets of the Court's order rejecting its arguments. Those do not reflect a misplaced burden; they reflect the Court's rejection of JELD-WEN's objections. Regardless, JELD-WEN fails to argue prejudice—that an assignment of burdens affected the outcome—and no reason exists to believe that the burden of proof mattered here.

**B.** JELD-WEN's arguments on the balance of hardships lack merit. The hardships bearing on *whether* divestiture was appropriate were resolved at *Brown Shoe* step one; the open questions at step two related only to Woodgrain as the buyer and the terms of that purchase. The District Court correctly found that Woodgrain paid a fair price— one that was a result of a fair and open process and that far exceeded

what JELD-WEN paid to unlawfully acquire all of CMI (not even accounting for the enormous profits JELD-WEN reaped from Towanda). In arguing otherwise, JELD-WEN ignores that it could have traded contractual terms with Woodgrain for a higher price, that a sale price can be affected by changing market conditions, that this was a forced sale, and that the Special Master conducted a fair process.

**C.**    The District Court correctly found that the sale to Woodgrain in particular was in the public interest because it brought to the market a new competitor distinctly capable of restoring competition, as Woodgrain is a former part-owner of Towanda.  JELD-WEN's contrary argument focuses on supposed efficiencies it could achieve if it kept Towanda.  But that argument goes to whether divestiture should occur at all, not whether Woodgrain was a suitable buyer.  And regardless, the District Court correctly found JELD-WEN's evidence of efficiencies lacking in multiple respects.

**III.**    JELD-WEN asks this Court to "reverse"—as if Towanda should be given back to it and the case closed.  Opening.Br.69.  Even if JELD-WEN's arguments here had any merit, they would at most be grounds for vacatur.  Steves presented alternative grounds for denying

both of JELD-WEN's motions, and those arguments should be considered by the District Court in the first instance. In particular, Steves presented the untimeliness and inequitable nature of JELD-WEN's Rule 60(b)(5) motion as alternative grounds for denying that motion—issues that the District Court left unresolved.

Moreover, the additional proceedings that would be necessary on remand—including potentially starting the remedial process over entirely—would be so undesirable and unsettling that they reinforce the correctness of the District Court's decisions. The prospect of unwinding this completed divestiture would pose a host of challenges. And even if divestiture could properly be unwound, a new remedy would be needed because the market would be left with an unremedied violation of the Clayton Act. None of that is necessary because the District Court brought this long-running litigation to a successful close. Its orders should be affirmed.

## STANDARD OF REVIEW

"Rule 60(b) proceedings are subject to only limited and deferential appellate review." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005). "Determining what is 'equitable'" under Rule 60(b)(5) "is necessarily a

task that entails substantial discretion." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992) (O'Connor, J., concurring). Appellate courts, accordingly, review denials of Rule 60(b) motions only for abuse of discretion, and "an appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 263 n.7 (1978). "To be upheld, a district court's [Rule 60(b)] decision need only 'appl[y] the correct legal standard and offe[r] substantial justification' for its conclusion." *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1622 (2025) (alterations in original) (citation omitted).

District courts similarly enjoy broad discretion in making equitable determinations, *Am. Stores Co.*, 495 U.S. at 294-95, and this Court reviews such decisions only for an abuse of discretion, *Steves*, 988 F.3d at 719.

This Court, accordingly, "accept[s] the [district] court's factual findings absent clear error, while examining issues of law de novo." *Solis v. Malkani*, 638 F.3d 269, 274 (4th Cir. 2011) (citation omitted).

## ARGUMENT

## I. The District Court Did Not Abuse Its Discretion in Denying JELD-WEN's Rule 60(b)(5) Motion

The District Court did not abuse its discretion in its thorough opinion denying JELD-WEN's Rule 60(b)(5) motion to vacate the divestiture decree. JELD-WEN failed to carry its burden of showing significantly changed circumstances, and the Court correctly recognized that the public interest favored divestiture because the competition-restoring purpose of that decree—countering the market power that JELD-WEN unlawfully acquired—had not yet been achieved.

JELD-WEN's arguments to the contrary reflect two overlapping errors. *First*, JELD-WEN incorrectly frames this case as presenting the question whether equitable relief, in the first instance, is appropriate. *See, e.g.*, Opening.Br.26-27 (standard-of-review section reciting four-factor test governing equitable relief, but not providing test for Rule 60(b)(5) relief). But the propriety of divestiture was already litigated by the parties, decided by the District Court, and reviewed and affirmed by this Court. *Second*, JELD-WEN fails to contend with the District Court's factual findings, much less identify any clear error. But "[f]acts

are conclusive on appeal" unless "they are plainly wrong." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378-79 (4th Cir. 1995).

## A. JELD-WEN Did Not Meet the Standard for Rule 60(b)(5) Relief

### 1. Rule 60(b)(5) Is an Extraordinary Remedy that Allows Relief from Judgment Only Where a Significant Change in Circumstances Renders Continued Enforcement Inequitable

Rule 60(b) provides an "extraordinary" remedy that "is only to be invoked upon a showing of exceptional circumstances." *United States v. Welsh*, 879 F.3d 530, 536 (4th Cir. 2018) (citation omitted). As relevant here, a court may grant relief from a judgment when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). A party invoking that rule bears the burden to show "'a significant change in circumstances.'" *Thompson v. HUD*, 404 F.3d 821, 827 (4th Cir. 2005) (quoting *Rufo*, 502 U.S. at 383). In turn, a court may grant relief from a judgment if that "'significant change'...renders continued enforcement ...'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 453 (2009) (quoting *Rufo*, 502 U.S. at 384); *Welsh*, 879 F.3d at 537 (affirming denial of Rule 60(b)(5) motion where "although there was a

change in circumstances, the public nonetheless had a substantial countervailing interest" in maintenance of the judgment).

Congress has announced where the public interest lies in antitrust cases. The Clayton Act "regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *Am. Stores*, 495 U.S. at 285; *see Steves*, 988 F.3d at 703. And that Act "authorizes injunctive relief in private suits 'not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws'—i.e., protecting competition." 988 F.3d at 720 (quoting *Am. Stores*, 495 U.S. at 284).

Accordingly, given Rule 60(b)(5)'s public-interest focus, an antitrust judgment ordinarily "may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved." *United Shoe*, 391 U.S. at 248. Thus, "[i]n most cases, the antitrust defendant should be prepared to demonstrate that the basic purposes of the [judgment]—the elimination of monopoly and unduly restrictive practices—have been achieved." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995); *accord Horne*, 557 U.S. at 450 ("[A] critical question in th[e] Rule 60(b)(5) inquiry is

whether the objective of the [challenged judgment]…has been achieved.").  That inquiry might naturally embrace consideration of the harms the decree was established to remedy, but it is not the re-run of the four-factor injunction test that JELD-WEN urges.  *See infra*, pp. 36-39.

The principle that an antitrust decree may not be changed in the defendant's interest when the purpose of the underlying litigation has not been achieved applies with particular force where, as here, a defendant seeks to set an unsatisfied judgment *entirely aside*—instead of merely seeking *modification*.  Outright vacatur typically occurs only where "the decree has served its purpose, and there is no longer any need for the injunction."  12 Moore's Federal Practice § 60.47(2)(c) (3d ed. 2025).  Moreover, in the antitrust context, courts are empowered to *broaden* a decree when time has passed and its "principal objects" have not been achieved, *United Shoe*, 391 U.S. at 251-52.  It would be especially anomalous to *shrink* (let alone *completely dissolve*) a decree when its "principal objects" have not yet been achieved.

## 2. JELD-WEN Failed to Make the Required Showing Under Rule 60(b)(5)

As the District Court found, JELD-WEN did not carry its initial burden of showing significantly changed circumstances. And granting JELD-WEN's motion would have meant vacating an antitrust judgment whose purposes had not been achieved, contrary to the public interest.

### (a) *Even with Athens Fully Online in Future Years, Steves Will Remain a Net Buyer of Doorskins*

JELD-WEN principally contends that Steves' ongoing construction at the Athens plant is a significant change in circumstances warranting relief. JELD-WEN insists that, because (according to JELD-WEN) the plant will allow Steves "to supply its own needs," Steves could not show any injury from JELD-WEN's continued ownership of Towanda. Opening.Br.41. And, JELD-WEN says, that plant will "create[] a third competitor in the doorskin market," which is "what the prior rulings said was needed to restore competition." Opening.Br.31.[2]

But JELD-WEN's factual premise is false, and it contradicts the District Court's unchallenged factual findings. Even under the most

_____

[2] Since divestiture closed in January 2025, there have been three doorskin competitors in the market—JELD-WEN, Masonite, and Woodgrain. Athens will not make Steves a fourth competitor.

optimistic projections (and setting aside that Athens had not produced a single doorskin as of the July 14, 2025 filing of this brief), Athens will not produce enough doorskins to supply Steves' needs—let alone allow Steves to sell to other Independents as a "competitor" of JELD-WEN. When—or, really, *if*, *see* JA__[2663.17] & n.8*—Athens operates at its maximum projected capacity, Steves will still need to buy doorskins from other manufacturers. As the District Court found, "assuming Steves has its plant up and running in 2025, it will produce only ███ █████ doorskins in 2025 and, assuming that all goes well, in 2026 and 2027, Steves expects to produce ████████ and █████████ doorskins, respectively," JA__[2663.17]*, and at its theoretical maximum, ███ █████ doorskins annually, JA__[2663.9-10]*. But Steves projects needing "██████ doorskins per year" from 2026 to 2028. JA__[2663.10]*. Crediting the analysis of economist Dr. Carl Shapiro (who also testified at the 2018 trial), the Court found that even with Athens fully online, "Steves will remain a net buyer of doorskins because it will need ███████████ more doorskins annually to meet its own doormaking requirements than its forthcoming plant is capable of producing." JA__[2663.17]*.

Without JELD-WEN's erroneous factual premise, its argument collapses. If JELD-WEN still owned Towanda after Athens begins producing doorskins, Steves would still need millions of doorskins from JELD-WEN; JELD-WEN could still withhold or overcharge for those doorskins as it did before; and Steves would still be harmed—irreparably—by JELD-WEN's continued control of Towanda. *Contrast, e.g.*, Opening.Br.58 ("[Steves] simply faces no meaningful harm absent divestiture."), *with* JA__[2663.20-22, 30-32]* (detailing continuing harms Steves would face absent divestiture), *and infra*, pp. 39-43 (same). Likewise, Steves will still not be JELD-WEN's competitor in selling doorskins because Steves will not have doorskins to sell. Thus, "without divestiture, Independents w[ould] still only have JELD-WEN and Masonite to turn to as suppliers of doorskins," JA__[2663.17]*, and harm caused by JELD-WEN's illegal acquisition would persist, regardless of Athens. *See* JA__[2663.18-19]*. Nothing about Athens will significantly change the conditions that led to the jury's liability verdict and the District Court's divestiture decree—and certainly nothing that would warrant "extraordinary" Rule 60(b)(5) relief, *Welsh*, 879 F.3d at 536.

JELD-WEN identifies no clear error in the District Court's finding that Steves will remain a net buyer even with Athens at full capacity. Yet its brief misstates this core factual point throughout—falsely claiming that Athens "is expected to be able to produce more doorskins than Steves purchases from JELD-WEN," Opening.Br.2, and will give Steves the "ability to supply its own needs," Opening.Br.41. Moreover, any argument on these facts is forfeited because JELD-WEN presented no countervailing factual evidence to the District Court. *See* JA__[2663.17]* ("The facts presented [by Steves] stand unrebutted.").

     (b)    *Vacating the Divestiture Decree Would Not Have Been in the Public Interest Because the Purpose of That Decree Had Not Been Achieved*

The District Court's denial of JELD-WEN's motion was separately supported by JELD-WEN's failure to show that a significantly changed circumstance "renders continued enforcement 'detrimental to the public interest,'" *Horne*, 557 U.S. at 453 (quoting *Rufo*, 502 U.S. at 384)—here, a showing that "the purposes of the litigation" have been "fully achieved," *United Shoe*, 391 U.S. at 248. *See* JA__[2663.19-20]* (identifying public-interest conclusion as alternative holding). In making that assessment, courts consider whether a defendant would be

able to "return to its former ways," *Board of Educ. v. Dowell*, 498 U.S. 237, 247 (1991). *See id.* (citing *United Shoe*, 391 U.S. at 248).

Here, the "purposes of the litigation," *United Shoe*, 391 U.S. at 248, were to counteract the market power that JELD-WEN obtained when it unlawfully acquired CMI. And the District Court correctly saw that granting JELD-WEN's motion would have left that anticompetitive merger undisturbed, leaving JELD-WEN to "return to its former ways," *Dowell*, 498 U.S. at 247, of trying to foreclose—or, in JELD-WEN's words, "kill off"—Independents, JA__[2663.20]*. *See* JA__[2663.30, 32-34]*.

JELD-WEN argued below that it would lack an "incentive to foreclose Independents" because it could not "do so profitably," but the District Court found otherwise on the evidence. JA__[2663.20]*. *First*, JELD-WEN's expert "examined only whether JELD-WEN would find it profitable to engage in *total* foreclosure." JA__[2663.20-21]* (emphasis added). But "the record establishe[d] that" JELD-WEN had previously used a "strategy of *partial* foreclosure by other means such as raising prices, lowering quality, or limiting the availability of particular doorskin styles" and that no basis existed for assuming that JELD-

WEN "would not have [an] incentive to once again engage in such conduct." JA__[2663.21]* (emphasis added); *see United States v. Swift & Co.*, 286 U.S. 106, 116 (1932) ("[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity proved to have been utilized in the past.").

*Second*, the District Court found JELD-WEN's expert's opinion flawed even as to total foreclosure because it assumed that if JELD-WEN foreclosed the Independents, Steves could "recapture lost door sales." JA__[2663.21]*. But Steves could not respond in that fashion, because it would lack a supply of doorskins—again, the "undisputed record" showed that Steves' "projected demand will exceed the projected capacity at its new plant." JA__[2663.21]*. With that "erroneous assumption…corrected," JELD-WEN's own expert's analysis established that JELD-WEN would "have an incentive to completely cut off the remaining Independents were it of a mind to do so or find it profitable to do so." JA__[2663.21-22]*.

JELD-WEN identifies no clear error in the District Court's factual findings about foreclosure. JELD-WEN asserts that the District Court's conclusions "cannot be squared" with the fact that "Steves' new

manufacturing capacity changes the market." Opening.Br.52. But the District Court *did* account for Athens' capacity in examining JELD-WEN's foreclosure incentives. And it found that if JELD-WEN retained control of Towanda, then the anticompetitive conditions that precipitated Steves' lawsuit would continue. JA__[2663.30]*. This case is not about "punish[ing] JELD-WEN for acts that are in the distant past and for which JELD-WEN already paid treble damages." Opening.Br.3. It is about how divestiture was—and remains *today*—a perfectly proportional remedy "to undo the ills of an anticompetitive merger." JA__[2663.35]* (citation omitted).

## B. JELD-WEN's Arguments in Favor of Rule 60(b)(5) Relief Are Mistaken

JELD-WEN's failure to argue under the standard applicable to Rule 60(b)(5) should resolve the issue. "It is Rule 60(b)'s standard—and *only* Rule 60(b)'s standard—that applies when a party seeks relief from final judgment." *BLOM Bank*, 145 S. Ct. at 1621 (emphasis in original) (discussing Rule 60(b)(6)). A "contrary approach" would disserve "the philosophy favoring finality of judgments and the expeditious termination of litigation." *Id.* (citation omitted). Regardless, JELD-WEN's contrary arguments lack merit on their own terms.

## 1. JELD-WEN's Irreparable Harm Argument Is Wrong on the Law and the Facts

JELD-WEN's lead theory is that (a) the District Court previously found irreparable harm in the likelihood that Steves would go out of business absent divestiture, (b) Steves no longer faces that threat, and so (c) the Court "erred by insisting on divestiture in the absence of proven irreparable harm." Opening.Br.31 (capitalization omitted). That theory is legally unsound, and it ignores that the District Court, while acknowledging that Steves no longer faced a threat of extinction, found that Steves would nevertheless face other irreparable harm.

**a.** JELD-WEN's legal position that Steves had to (re)prove irreparable harm is legally unsupported and hopelessly unworkable.

JELD-WEN's thesis is that "a court cannot proceed with an injunction when a private party's irreparable harm no longer exists," based on the principle that a court has "no authority to order any equitable relief *at the outset* without a clear showing of irreparable harm." Opening.Br.34 (emphasis added). But JELD-WEN's support for that tenuous reasoning consists chiefly of cases addressing injunctive relief *in the first instance*, not modification or vacatur of an existing injunction under Rule 60(b)(5). *See* Opening.Br.32-34. Those cases "did

not involve the dissolution of an injunction, but the question of whether an injunction should be issued in the first place." *Dowell*, 498 U.S. at 248 (rejecting reliance on precedent governing *entry* of injunction where the question concerned *dissolution* of injunction). The lone Rule 60(b)(5) authority JELD-WEN cites—*Horne*—makes no mention of the traditional four-factor test (or any of its components), and instead states the Rule 60(b)(5) test articulated above: "whether the objective of the District Court's [original] order…has been achieved." 557 U.S. at 450.

*Government of Province of Manitoba v. Zinke*, 849 F.3d 1111 (D.C. Cir. 2017), is instructive: Much like JELD-WEN here, the litigant there sought to modify an injunction by "asking the district court to apply the four factors" used to assess whether preliminary injunctive relief should issue, "as opposed to the standards under Rule 60(b)(5)." *Id.* at 1119. The D.C. Circuit explained that such framing was "legal error" that had "significantly handicapped [the litigant's] own motion." *Id.*

JELD-WEN's position would collapse the Rule 60(b)(5) standard into the standard governing injunctive relief in the first instance. Consider how unworkable and damaging to finality this would be: In the District Court, JELD-WEN demanded that, because Steves no

longer faced extinction, Steves "point to some *other* injury" to support divestiture. JA__[2457.25] (emphasis added). But when Steves did so, JELD-WEN attacked Steves' evidence because it had not been submitted to a jury. JA__[2581.7, 17] ("[N]o factfinder has found[] any causal link between Steves' new quality concerns and the merger.").[3]

Accepting JELD-WEN's position would require no less than a second trial—and perhaps a parade of retrials beyond—upending the concept of a "final" judgment. A "balance must…be struck between the policies of res judicata and the right of the court to apply modified measures to changed circumstances." *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647-48 (1961). "Firmness and stability" require that "neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided." *Id.* at 647.

---

[3] JELD-WEN's new position—not advanced below—appears to criticize the irreparable harm found by the District Court as "categorically different" from the original harm established at trial. Opening.Br.41. That approach is no better. It would push parties into wasteful efforts to develop their trial record on all conceivable "categories" of harm in order to insulate judgments from later attack. Nor is it tenable to burden *the prevailing plaintiff* with making a full-scale presentation that the irreparable harm established at trial has not changed, when the "party seeking modification of a [final judgment] bears the burden." *Rufo*, 502 U.S. at 383.

When a party seeks to modify an equitable judgment, the court is "not framing a decree. [It is] asking [itself] whether anything has happened that will justify [it] now in changing a decree." *Swift*, 286 U.S. at 119. This Court should decline JELD-WEN's invitation to permit the unbounded relitigation of settled issues.

**b.** Regardless, the District Court found in the alternative that Steves would have suffered irreparable harm absent divestiture. Without divestiture, the Court explained that Steves, "like the other Independents, will be forced to buy doorskins from JELD-WEN or Masonite." JA__[2663.29]*. But because Masonite "sells to Independents only on a spot sale basis," Steves and the other Independents would "be subject to JELD-WEN's exercise of the market power that the jury found offended the Clayton Act." JA__[2663.29-30]*.

That dependence threatened multiple irreparable harms. *First*, JELD-WEN would "retain[] the power and incentive to adversely affect Steves in serious ways by depriving it of the ability to meet its existing customer demand or to compete with JELD-WEN and others for new business." JA__[2663.30]*. Although Steves could in principle sue

JELD-WEN for uncertain damages in seriatim future suits over that anticompetitive conduct, "the necessity of multiple suits is a classic justification for finding common law remedies inadequate," and equitable relief warranted. *PBM Prods., LLC v. Mead Johnson & Co.*, 2010 WL 957756, at *3 (E.D. Va. Mar. 12, 2010), *aff'd*, 639 F.3d 111 (4th Cir. 2011); *see Matthews v. Rodgers*, 284 U.S. 521, 529-30 (1932); JA__[2538.23]; JA__[2605.12-13]. Preferring a certain one-time equitable remedy was firmly within the District Court's discretion, given JELD-WEN's demonstrated history of being willing and able to exercise its unlawfully acquired power in the market. *See Steves*, 988 F.3d at 720 ("Without divestiture, the threat to Steves inherent in the merger would not cease in the foreseeable future." (citation modified)).

*Second*, the District Court credited Steves' evidence that, *even as divestiture approached*, JELD-WEN was using its market power to push defective doorskins on Steves—nearly 2 million by the end of 2024. JA__[2663.30-31]*; *cf. Steves*, 988 F.3d at 700-01 (discussing quality problems following JELD-WEN's acquisition of CMI). Although JELD-WEN was reimbursing Steves for defective doorskins, those payments were "effectively meaningless to Steves and its customers" because

Steves could not "obtain additional doorskins (from JELD-WEN or elsewhere) to meet customer demand for doors." JA__[2663.31]* (quoting JA__[2538.26]). The harm to Steves was irreparable, the District Court found, because the "quality problems have created harm to the reputation of Steves and portends a loss of good will." JA__[2663.31]*; *see Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552-53 (4th Cir. 1994) (reputational harm and anticipated loss of goodwill are quintessential irreparable harms).

JELD-WEN's responses lack merit. *First*, JELD-WEN objects that the irreparable harm the District Court found is "new." Opening.Br.41. But no authority says equity is so hamstrung that it evaluates changed circumstances by considering the absence of yesterday's harms but ignoring the presence of today's. And having *invited* Steves to submit evidence of "new" irreparable harm below, JELD-WEN should not be heard to argue the opposite now. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (applying judicial estoppel).

*Second*, JELD-WEN argues that Steves has "not *proven* the existence of such harm in this case with *evidence*." Opening.Br.41 (emphases in original). But no amount of appellate-brief italics can overcome sworn declarations, expert analysis regarding foreclosure, a seven-hour hearing, and an opinion based on the "facts…found by a preponderance of the evidence found in the trial record, the divestiture hearing records, and the exhibits submitted with the briefs" on JELD-WEN's motion. JA__[2663.1-2, 30-31]*.

*Third*, JELD-WEN's claim that Steves did not "show how such an injury would persist given its ability to supply its own needs," Opening.Br.41, conflicts with the District Court's well-supported factual finding that Steves will *not* be able to supply its own needs. *See supra*, pp. 29-32.

*Finally*, JELD-WEN argues that the District Court improperly "suggested that Steves' lack of irreparable harm did not matter because divestiture would still benefit other independents." Opening.Br.42-43. That argument misconceives the District Court's reasoning, which properly reflected that divestiture is a structural remedy concerned with competition, not any particular competitor. *See* JA__[2663.32-35]*

(quoting *Steves*, 988 F.3d at 720-21). As this Court had explained, the Clayton Act authorizes injunctive relief in private suits "not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws—i.e., protecting competition." *See* JA__[2663.32]* (quoting *Steves*, 988 F.3d at 720); *accord Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988) (affirming denial of modification and explaining that "courts sitting in equity are obliged to consider the interests of all those affected by a decree"). The District Court rightly considered whether the larger purpose of the divestiture decree had been achieved—not as a substitute for, but in tandem with, irreparable harm. *See* JA__[2663.33-35]*.

### 2. JELD-WEN Is Wrong that Competition Would Have Been Restored Absent Divestiture

JELD-WEN separately argues that Steves' Athens plant "restores a three-competitor market (JELD-WEN, Masonite, and Steves) absent divestiture." Opening.Br.45. That argument fails for reasons already given: Even with Athens fully online, Steves would remain a net buyer and the market would look much as it did while JELD-WEN owned Towanda. *See supra*, pp. 29-32.

JELD-WEN nonetheless complains that the District Court improperly "redefine[d]" a new market by focusing on "'supplier[s] *to the other Independents*.'" Opening.Br.49 (quoting JA__[2663.17]*, alteration in JELD-WEN's brief). But that is not a redefinition of the market: The Court was explaining there that *Steves* would not be a supplier in the market capable of restoring competition (because it would remain a net buyer) and focusing on supply to Independents because that is specifically where the pinch of JELD-WEN's illegal acquisition had been and would be felt.

Similarly, JELD-WEN points to statements from this Court and the District Court reasoning that divesting Towanda and thereby adding a third doorskin supplier would "promote competition." Opening.Br.47 (quoting *Steves*, 988 F.3d at 724). From these, JELD-WEN would extract a principle that any three market participants would undo the unlawful merger's anticompetitive effects. *See* Opening.Br.49-51. But that is not what this Court or the District Court ruled, and it is obviously incorrect: For example, nobody would argue that the doorskin market's affliction would be cured by the entry of a third supplier offering a paltry 1,000 doorskins a year. The relevant

question is—and has always been—what can restore the competition

lost from JELD-WEN's illegal acquisition.  Divesting Towanda to

Woodgrain restores that competition, in perfect proportion to JELD-

WEN's wrongful conduct.  Steves' ability to produce some doorskins—

but not to be a net seller—does not.  For that reason, the District Court

properly denied JELD-WEN's Rule 60(b)(5) motion.

## II.  The District Court Did Not Abuse Its Discretion in Adopting the Special Master's Divestiture Report & Recommendation and Overruling JELD-WEN's Objections

JELD-WEN broadly argues that, in deciding whether to adopt the

R&R, the District Court "inverted the burden of proof while

misapplying the balance-of-hardships and public-interest factors"

because Steves, as the party "seeking" divestiture, was required to

satisfy the *eBay* factors.  Opening.Br.54.

That argument is misconceived because Steves was not "seeking"

divestiture; the equity of divestiture had already been litigated,

ordered, and affirmed during step one of the *Brown Shoe* proceedings.

The relevant step-two question was merely "whether a sale to [the

chosen] particular buyer [i.e., Woodgrain] will serve the public interest."

*Steves*, 988 F.3d at 724.  JELD-WEN offers no authority for the

proposition that the District Court erred by not *reopening* the third and fourth *eBay* factors in evaluating the R&R when both of those factors had been considered, weighed, and settled by this Court in 2021. *E.g.*, Opening.Br.54-64 (relying almost entirely on *Winter v. NRDC*, 555 U.S. 7, 24 (2008) and *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).

Regardless, JELD-WEN's particular challenges to the District Court's order adopting the Special Master's R&R pursuant to Federal Rule of Civil Procedure 53(f) lack merit, as explained below.

## A.     The District Court Placed No Improper Burden on JELD-WEN

JELD-WEN first attacks the District Court's order approving divestiture to Woodgrain by contending that the Court forced JELD-WEN to shoulder the burden on issues that should have been Steves' to prove. Opening.Br.54-57.

1.     JELD-WEN omits the context for the District Court's order. After this Court affirmed the divestiture decree in 2021, the District Court tasked the Special Master with managing the bidding process, identifying a buyer and transaction, and evaluating that buyer and the terms of the transaction in the first instance. *See supra*, pp. 8-12;

*Steves*, 988 F.3d at 722-23 (anticipating this approach). The Special Master's appointment and duties are not in dispute here. Those duties included detailing the bidding process and explaining his conclusions that Woodgrain "has the business acumen, experience, and financial ability to successfully operate…Towanda"; that "Woodgrain's acquisition of Towanda would restore competition to the doorskins market"; and that "the price Woodgrain [wa]s offering [wa]s reasonable under the existing circumstances." JA__[2551-1.30, 32, 34].

Because that R&R was focal—it proposed a transaction for the District Court's approval or rejection—the practical way to evaluate that recommendation was for the parties to support it or object to it. JELD-WEN raised various objections, JA__[2593]; Steves generally supported it, with some limited objections, JA__[2594]; Woodgrain gave notice that it, naturally, had no objections, JA__[2592]; and the parties filed extensive supporting and responding papers. Although JELD-WEN makes *no* mention of the Special Master or the objections process in discussing the District Court's order, *see* Opening.Br.54-69, that was the fully developed record upon which the District Court concluded that

the divestiture transaction arranged by the Special Master should be approved.  *See* JA__[2661]*.

2.　　JELD-WEN now says that the District Court improperly burdened it with disproving that the recommended sale to Woodgrain was appropriate.  *See* Opening.Br.56 (citing JA__[2661]*).  But the District Court presumed nothing and deferred to nobody; it made its own determination that the transaction was appropriate.  *See* JA__[2661.56]* (citing Fed. R. Civ. P. 53(f), providing for de novo review of a special master on issues of fact and law).

JELD-WEN selectively quotes the District Court's explanations of why JELD-WEN's specific objections lacked merit, to portray them as wholesale misunderstandings of the Court's role.  *See* Opening.Br.56.  For example, JELD-WEN assigns error to the Court's statement that JELD-WEN failed to "provide[] sufficient evidence or convincing arguments."  Opening.Br.56 (quoting JA__[2661.17]*).  But that is perfectly natural phrasing in addressing evidence and arguments JELD-WEN presented as reasons the Court "should decline to accept" that R&R.  JA__[2593.4].  Often in passages JELD-WEN quotes, the Court was simply responding to JELD-WEN's arguments as the

objecting party. *Compare*, *e.g.*, Opening.Br.56 (complaining that District Court asked whether "divestiture to Woodgrain was *in*equitable") (emphasis in original), *with* JA__[2593.1] (JELD-WEN's objection that divestiture "would be inequitable"). No reason exists to construe the Court's discussion as JELD-WEN does. *Cf. Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("[T]he language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." (second alteration in original) (citation omitted)).

Nor does JELD-WEN's artificial reading account for all the affirmative findings in the District Court's order. For example, the Court plainly *did* assess whether there was a sufficient showing that divestiture to Woodgrain would restore competition and that the price Woodgrain would pay was reasonable. The Court explained that "[t]he record supports the Special Master's view that Woodgrain will likely be able to profitably operate Towanda post-divestiture" and that Woodgrain's bid was "the obtainable—fair and reasonable—price," particularly given the "forced-sale process." JA__[2661.37, 45, 47]*. And the Court approved divestiture to Woodgrain based on well-supported conclusions that "Woodgrain's acquisition of Towanda will

likely restore competition to the U.S. doorskin market" and that its bid price "is fair and reasonable."  JA__[2661.16, 37]* (capitalization omitted).  That the Court *also* held that JELD-WEN's objections did not undermine those conclusions shows only that it considered JELD-WEN's arguments—and rejected them.

**3.**    Even if the District Court had inverted the burden, JELD-WEN nowhere explains why that would have made any difference.  For example, despite decrying the Court's isolated statement that JELD-WEN failed to "provide[] sufficient evidence or convincing arguments," Opening.Br.56 (quoting JA__[2661.17]*), JELD-WEN never claims that the record lacks evidence and arguments to carry Steves' and Woodgrain's burdens.  No reason exists to think that the burden of proof would be decisive here—on a matter of equitable discretion, with facts decided by a preponderance of the evidence, making an approve-or-reject decision on a proposed transaction, all pending before a district judge and special master immersed in the matter for years.  *Cf. Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021) (explaining that the "burden of persuasion will have bite only when the court finds the evidence in equipoise").

JELD-WEN's omission of an explanation of prejudice alone dooms its argument. Harmless error is the default rule in civil appeals. *See* 11 Wright & Miller's Federal Practice & Procedure § 2888 (3d ed.) ("*Wright & Miller*"); Fed. R. Civ. P. 61. Even errors in civil jury instructions going to burden are disregarded if the circumstances are such that the error "could not have changed the result." 11 *Wright & Miller* § 2886.

Because JELD-WEN failed to identify any prejudice in its opening brief, it has forfeited any such argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief…."); *Guzman v. Allstate Assurance Co.*, 2023 WL 6807054, at *3 & n.12 (5th Cir. Oct. 16, 2023) (per curiam) (declining to consider whether district court erred in admitting testimony where prejudice was raised "[f]or the first time in [the appellant's] reply brief" and was therefore forfeited).

## B. JELD-WEN's Balance-of-Hardships Argument Fails

JELD-WEN contends that the balance of hardships disfavors divestiture to Woodgrain because Steves (supposedly) no longer faced any harm and JELD-WEN (supposedly) faces harm from the price that Towanda fetched in the bidding process. The argument is wrong from

start to finish:  The District Court was not required (nor, indeed, permitted) to reconsider the balance of hardships, and JELD-WEN's arguments contradict the record and the factual findings below.

### 1.    The District Court Was Not Permitted to Reweigh the Balance of Hardships

The proceedings below were cabined to the second step of the *Brown Shoe* two-step divestiture process that the District Court adopted and this Court approved in the prior appeal.  *See Steves*, 988 F.3d at 722; JA__[1784.149]*.  Having already decided at step one that divestiture is appropriate (with this Court's affirmance), JA__[1784.100-01, 148]*, the District Court's task on remand was to "work out the particulars," with this opportunity for appellate review of second-step issues, JA__[1784.100]*.  Bifurcating the question *whether* divestiture of an asset is appropriate from the question of to *whom* and on *what terms* the asset should be divested removed "[t]he unsettling influence of uncertainty" over whether a divestiture decree will be affirmed on appeal, *Brown Shoe*, 370 U.S. at 309, thereby "attract[ing] more buyers" at step two, "thus serv[ing] the public interest," *Steves*, 988 F.3d at 722.

Accordingly, the relevant questions now relate to the specifics of divestiture to Woodgrain: whether it was a "satisfactory" buyer and whether it paid an acceptable price. *Steves*, 988 F.3d at 722; *see* JA__[1784.60-61]* (leaving the question of whether the bidding process would yield a fair price until after JELD-WEN's appeal of the divestiture decree).

JELD-WEN's far-reaching balance-of-hardships arguments in this second appeal clash with this Court's decision approving the *Brown Shoe* approach. At the first step, this Court affirmed that the balance of hardships favored divestiture—*i.e.*, that the harms "divestiture would cause JELD-WEN" were outweighed by the harms "Steves would suffer in [divestiture's] absence." *Steves*, 988 F.3d at 721. Because the balance-of-hardships question goes to "[t]he propriety of divestiture"— which has already been decided—further consideration is now "foreclosed." *Brown Shoe*, 370 U.S. at 309.

Revisiting that balance (or any number of other already-decided issues) would defeat the two-step process's purpose of ensuring that "an appropriate remedy is settled on appeal and the landscape is clear," giving potential bidders the confidence that, so long as they are

"[]satisfactory" purchasers, the divestiture will go through.

JA__[1784.52, 104]*; *Steves*, 988 F.3d at 722, 724. This Court should reject JELD-WEN's effort here to inject the very "unsettling influence of uncertainty" that the District Court, this Court, and the Supreme Court have all recognized would defeat "[t]he public interest" by making a contested divestiture effectively impossible. *Brown Shoe*, 370 U.S. at 309; *Steves*, 988 F.3d at 722.

### 2. Absent Divestiture, Steves Would Have Continued to Face Harm

Even if the District Court could have rebalanced the hardships, JELD-WEN's argument would fail. As to Steves, JELD-WEN insists that the hardships "inquiry is now simple" because, if divestiture is unwound, "Steves [will] face[] no proven risk of future harm." Opening.Br.58. Once again, because Steves will remain a net buyer of doorskins, JELD-WEN's argument is wrong and contrary to the District Court's factual findings. *See supra*, pp. 29-32.

### 3. The District Court Correctly Found that Woodgrain Paid a Fair Price for Towanda

As for JELD-WEN's "hardship," the District Court's finding that the $115 million that Woodgrain paid for Towanda is fair and reasonable is similarly unimpeachable. JA__[2661.47]*;

JA__[2663.28]*.  Whether treated as part of the balance of hardships or as a freestanding issue properly addressed at *Brown Shoe*'s second step, JELD-WEN's objections to the price paid for Towanda lack merit.

a.     First, some context.  The price was the result of an open bidding process that JELD-WEN has never claimed was conducted unfairly.  *See* JA_[2480.30:2-6].  That process aimed at the primary goal of restoring competition and the secondary goal of securing a fair price.  *See* JA__[1863.5-6]*; JA__[2661.38-39]*.  The District Court appointed a Special Master (who in turn retained specialty advisors) to "assure, to the extent reasonably possible, that JELD-WEN receives a fair price for Towanda, and to assure that divestiture produces a competitive entity that is likely to restore competition."  JA__[1784.148-49]*.  Accordingly, the Special Master was to "assure that the divestiture [was] conducted in a realistic setting that is conducive to attracting qualified buyers who [would] pay a fair price for Towanda."  JA__[1784.149]*.

JELD-WEN does not contend that the Special Master failed to conduct such a process, or that Woodgrain paid anything other than "such price and…such terms…that [we]re then obtainable upon reasonable effort by the Special Master," JA__[1863.4]*.  And JELD-

WEN identifies no other metric by which the District Court could have assessed the fairness of the price paid while still accomplishing the divestiture decree's primary purpose.

Moreover, the $115 million that Woodgrain paid to JELD-WEN for Towanda was far more than what JELD-WEN paid in 2012 to purchase *all* of CMI, whose business included assets in addition to Towanda. JA__[2661.46] n.7*.  JELD-WEN's own records show that, in purchasing CMI, it allocated approximately ███████ of the price to Towanda.  JA__[2489.1-3]; JA__[2663.26]*.  Thus, the divestiture price exceeded JELD-WEN's purchase price for Towanda by more than ███ ████—a ████ gain for JELD-WEN.  JA__[2663.26]*.  But even that is dwarfed by the staggering "ill-gotten gains totaling over ███████" that JELD-WEN earned from Towanda in the meantime.  JA__[2661.46] n.7*; *see* JA__[2489.4].  As the District Court saw, the arc of this matter—from JELD-WEN's illegal acquisition through divestiture—left JELD-WEN far ahead of where it would be if it had complied with the law in the first place.

**b.** JELD-WEN's attacks on the purchase price itself were fully addressed by the District Court.[4] JELD-WEN would benchmark the purchase price against Towanda's "value," as posited by its expert and as compared to the prices offered in the first-round bidding in 2021. Opening.Br.60, 62-64. The Court rejected those comparisons, finding that they failed to grapple with the context in which Woodgrain was bidding: a forced, judicially managed sale in an evolving market.

From the start, the District Court recognized that "a forced sale always contains some presumed detriments for the seller" yet it still ordered divestiture. JA__[1784.60]* (quotation marks omitted). "[A]lbeit in a different context, the Supreme Court has explained that 'market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale

---

[4] JELD-WEN says that the District Court "disregarded" the "low price" Woodgrain paid because "JELD-WEN had violated the Clayton Act and divestiture would serve the 'public purpose of protecting competition.'" Opening.Br.61 (quoting JA__[2661.39]*). But the Court literally wrote the opposite: It noted that JELD-WEN's price objection sought to "subjugate the public purpose of protecting competition to JELD-WEN's private interest of receiving the maximum payout conceivable for Towanda." JA__[2661.39]*. But it "[p]ut[] th[at] consideration[] aside" and "fully address[ed] JELD-WEN's objection" that Woodgrain's offer was "not a 'fair' price." JA__[2661.39]*.

value.'" JA__[2663.27] n.14* (quoting *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994)).

In particular, JELD-WEN's contention that Towanda is "worth" ███████████ relied entirely on a valuation opinion from its expert that the District Court concluded was "incomplete and unpersuasive" because it did "not account for the fact that JELD-WEN is being made to sell Towanda by force." JA__[2661.40-41]*. The Court agreed instead with Steves' expert's opinion that that fundamental omission made JELD-WEN's comparison "'largely meaningless.'" JA__[2661.41]* (quoting JA__[2605-5.3]). JELD-WEN retorts (without elaboration) that its "expert *did* consider the unique circumstances of this forced sale at length." Opening.Br.62. But the Court addressed that too: JELD-WEN's expert's "analysis may be 'about' those uncertainties (i.e., includes a discussion of them), [but] that does not refute the fact that [he] did not account for those uncertainties in his underlying estimation of Towanda." JA__[2661.42-43]*. The Court was well within its discretion to reject JELD-WEN's reliance on a "far from…reliable comparison." JA__[2661.42]*.

Beyond its inapposite valuation, JELD-WEN points out that bids declined over successive rounds. *See* Opening.Br.63. Here too, the District Court provided a complete and sensible answer. Towanda's sale "[wa]s not an event in isolation," but "the result of a *process*." JA__[2661.43]*. The price not only would be subject to "downward pressure" from "the forced sale itself," but also "necessarily" would be affected by "circumstances and events that occurred over[ ]time before achieving finalized bids." JA__[2661.43-44]* (discussing "declining supply or demand for goods, effects of changing interest rates on capital and investment, and market participants choosing to enter or leave a market"). Here, JELD-WEN's own financials revealed "market softness for both [Towanda's] doorskins and its trim lines," which the Special Master found "added to the increasing and various difficulties of consummating a sale." JA__[2551-1.18]; *see* JA__[2661.44]* (noting this as "normal market condition[]"). JELD-WEN nowhere accounts for the reality that markets rise and fall, and the seller in a forced sale has no right to time the market for its own benefit.[5] In short, the District

---

[5] JELD-WEN's attempts to place blame elsewhere—including on Steves, *see* Opening.Br.63—ignore that (as the District Court and Special

Court did not abuse its discretion in concluding that the $115 million Woodgrain paid was "fair."  JA__[2661.47]*.

## C.    JELD-WEN's Argument that Divestiture Was Not in the Public Interest Fails

JELD-WEN's final challenge is that "divestiture [would] affirmatively harm independent doormakers" and is inequitable as "not serv[ing] the public interest."  Opening.Br.64.  It relies on (1) a declaration of one of its customers (a board member of ███████, an Independent) expressing the view that his company would have been better off if "JELD-WEN retain[ed] ownership and control" of Towanda (the "customer declaration") and (2) its antitrust expert's prediction that divestiture would increase freight and production costs and doorskin prices.  Opening.Br.65-66 (citation omitted).  But such evidence goes to

---

Master concluded) JELD-WEN itself contributed to uncertainties that may have affected bid prices.  *See* JA__[2661.45] n.6* (noting that had JELD-WEN not objected to the second-round ████████ bid, it "may very well have received more money than it looks to receive today"); JA__[2663.11]* (noting that another bidder withdrew, citing JELD-WEN's Rule 60(b)(5) motion).  Similarly, Woodgrain was reluctant to close the divestiture while JELD-WEN maintained its appeal right, but Woodgrain ultimately agreed to accept the lack of finality.  *See* JA__[2642.7:21-25, 12:16-16:16, 49:14-16, 59:20-60:7] (colloquies with the District Court on this issue).  Here too, JELD-WEN could have sought a higher price by giving greater certainty, but it chose otherwise.

whether Towanda should have been divested at all (a question resolved at *Brown Shoe* step one), not whether it should have been divested to Woodgrain (the issue at step two). Regardless, the District Court found JELD-WEN's evidence lacking, and it reasonably concluded that Woodgrain was a satisfactory buyer of Towanda.

## 1. JELD-WEN's Public-Interest Evidence Addressed the Wrong Question

As the District Court held, JELD-WEN's public-interest arguments missed the mark because they addressed whether Towanda should be divested *at all*, not whether Towanda should have been divested *to Woodgrain*. JA__[2661.25-26]*.

JELD-WEN itself says that the customer declaration urged that "'divestiture of Towanda…no longer be required'" because JELD-WEN would be better situated to operate Towanda than "'an independent new company.'" Opening.Br.65 (quoting JA__[2457-3.4-5]). Similarly, JELD-WEN points to its expert's prediction that divestiture would increase shipping costs because JELD-WEN owned a "nationwide network of doorskin plants" and Woodgrain did not. Opening.Br.66. But, to create an *additional* competitor in the doorskin market, *any* prospective buyer necessarily would lack a "nationwide network of

doorskin plants." Both claims boil down to a contention that control of Towanda would best be in JELD-WEN's hands.

That question was no longer before the District Court. As with the balance of hardships, the District Court had already concluded, and this Court had already affirmed, that the public interest favors Towanda's divestiture. *See Steves*, 988 F.3d at 721-24. Indeed, the thrust of JELD-WEN's argument now was the same as JELD-WEN's argument to the jury years ago that the efficiencies it could offer in operating Towanda warranted leaving the plant in JELD-WEN's hands. JA__[2661.30-31]*. But the jury rejected that very argument, and this Court affirmed. JA__[2661.30-31]*; *Steves*, 988 F.3d at 729. As the District Court recognized—and JELD-WEN does not dispute here— there is no evidence that those claimed efficiencies are "in any way different today than they were" at the time of trial. JA__[2661.31]*. No reason existed to relitigate those efficiencies through an objection to the R&R. JA__[2661.30-32]*.

## 2. The District Court Correctly Rejected JELD-WEN' Public Interest Evidence on Its Own Terms

JELD-WEN's efficiencies-related evidence was, in any event, legally insufficient to justify retaining control over Towanda.

"Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967).  Thus, to justify an otherwise-unlawful merger—especially where "high market concentration" exists (as it does here, *see Steves*, 988 F.3d at 716)—efficiencies must be "extraordinary." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720-21 (D.C. Cir. 2001); *see FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 81 (D.D.C. 2015).  The proffered efficiencies must be "verifiable, not merely speculative." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 791 (9th Cir. 2015).  And the efficiencies must be of a "nature, magnitude, and likelihood" that would counteract harm in the relevant market—in other words, they must outweigh anticompetitive harms.  JA__[2535-5] § 3.3 (government's horizontal merger guidelines in effect at time of proceeding below).

The customer declaration here offers one industry participant's conclusory views about how his company would benefit from JELD-WEN retaining Towanda, unsupported by any empirical or other support for his speculation that "an independent new company *may* not"

serve his company's needs.  JA__[2457-3.4] (emphasis added).  The

District Court—as a finder of fact—reasonably discounted that

declaration because it "addressed [only] what [the customer] thinks best

for [that customer]," recognizing that "what is best for [that customer] is

not the issue."  JA__[2663.24] n.13*.[6]  JELD-WEN never attempted to

establish a foundation for the customer to testify about the competitive

interests of the entire industry—a topic suited for expert witnesses

under Rule 702, not lay witnesses who are limited to testifying to their

personal knowledge.  *Cf. United States v. Perkins*, 470 F.3d 150, 156

(4th Cir. 2006) ("Rule 701 forbids the admission of expert testimony

dressed in lay witness clothing").

As for JELD-WEN's expert, he concededly did not compare (a) the

supposed efficiencies JELD-WEN could offer from lower costs against

(b) the clear competitive harms that would persist had JELD-WEN

remained Towanda's owner.  JA__[2605-1.133:14-134:3].  Indeed, he did

---

[6] JELD-WEN protests that "███████ evidence was not ███████-specific."  Opening.Br.65.  But JELD-WEN's own representations show otherwise.  *See* JA__[2593.2] (the customer "opposes divestiture because *its own interests* are better served if JELD-WEN retains Towanda" (emphasis altered)); JA__[2593.10] (describing declaration as "stating that [*the customer's*] *competitive interests* are best served by allowing JELD-WEN to retain Towanda" (emphasis added)).

not do even *half* of that task—he never quantified the extent to which any efficiencies from JELD-WEN's ownership of Towanda would be passed on to customers—let alone make the necessary comparison. JA__[2605-1.131:9-22].

### 3. The District Court Properly Addressed Whether Woodgrain's Ownership of Towanda Would Serve the Public Interest

JELD-WEN finally criticizes the District Court for supposedly ordering divestiture-by-default, with Woodgrain simply "the least bad option." Opening.Br.68. Rhetoric aside, what matters—and what JELD-WEN cannot dispute—is that the District Court relied on an extensive record to find that Woodgrain was an entirely suitable buyer.

In particular, the District Court and Special Master each thoroughly assessed Woodgrain's ability to run Towanda. They relied on Woodgrain's internal data submitted with its bids, publicly available information about Woodgrain's business and its history, and input from the Special Master's professional advisors.

The District Court considered the R&R and the parties' arguments, and it independently concluded that Woodgrain could and would operate Towanda alongside its other facilities to serve the market

and further the public interest.  JA__[2661.29-30]*.  Woodgrain is a "prior owner of the [Towanda] facility," "better suited, compared to other potential acquirers, to efficiently operate and quickly integrate Towanda's capabilities alongside the rest of its suite of facilities and products."  JA__[2661.29-30]*.  The Court considered the Special Master's analysis and Woodgrain's own representation that "Woodgrain would not purchase the Towanda facility if it did not believe it could operate the facility successfully and profitably."  JA__[2661.36]* (citation omitted).  And the Court took care to confirm that Woodgrain would be able to operate Towanda profitably *regardless of demand from Steves*, such that the plant could continue to compete effectively in Woodgrain's hands. JA__[2661.34-35]*.

Considering all that and more, the Court found that Woodgrain was "an acceptable purchaser of Towanda."  JA__[2661.25]*.  Those are the factual findings that matter, and JELD-WEN identifies no error in them.

## III.   JELD-WEN Fails to Contend with the Undesirable Practical Consequences of Accepting Its Arguments

Although JELD-WEN largely ignores the practical consequences of its arguments, it suggests in passing that, should it prevail here,

Towanda would be returned to JELD-WEN, and the case would end.  As explained, there is no error in either of the District Court's orders.  But, if this Court were to do anything but affirm, JELD-WEN is also mistaken about what would come next.  The additional proceedings that would be necessary on remand—addressing unresolved issues and potentially starting the remedial process over entirely—would be so undesirable and unsettling that they reinforce the wisdom of the District Court's judgment that divestiture to Woodgrain was the remedy best calculated to serve the public interest.

## A.   Absent Affirmance, the District Court Would Need to Address or Revisit Unresolved Issues in the First Instance

Although JELD-WEN urges this Court to "reverse" (Opening.Br.69), its arguments are largely for vacatur.  For example, even if JELD-WEN's attacks on the District Court's public-interest analysis had merit, the proper appellate disposition would be for this Court to vacate so the District Court could conduct that analysis in the first instance.  Ordering and executing divestiture is an intensely fact-based matter in which the "District Court is clothed with large discretion to fit the decree to the special needs of the individual case."

*Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quotation marks omitted).

Similarly, there were two independent and dispositive bases for denying JELD-WEN's Rule 60(b)(5) motion that the District Court did not reach. *First*, although a party moving under Rule 60(b) "must first show…that the motion is timely," *Welsh*, 879 F.3d at 533, JELD-WEN failed to file its Rule 60(b)(5) motion until long after it "knew or should have known the basis for [its] 60(b) claim," *Moses v. Joynor*, 815 F.3d 163, 167 (4th Cir. 2016). *See* Fed. R. Civ. P. 60(c). JELD-WEN knew about Steves' plans to build a doorskin manufacturing plant *years* before it brought its Rule 60(b)(5) motion in May 2024. JA__[2464.4-9, 16-19]; *see* JA__[2222.21]. Below, the Court agreed that JELD-WEN's motion "was filed well after it became known that Steves disclosed plans to build its own doorskins plant" and that there was therefore "much to be said" for Steves' timeliness arguments, JA__[2663.13]*, but it elected to resolve JELD-WEN's Rule 60(b)(5) motion on the merits instead.

*Second*, JELD-WEN's unclean hands independently warrant denying its Rule 60(b)(5) motion. Because "[t]he discretionary relief

available under Rule 60(b) is equitable," *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2d Cir. 2009), a movant's failure to act equitably is groundw for denying such a motion. *See* 12 Moore's Federal Practice § 60.22[5] (3d ed. 2008) ("[I]n exercising its discretion under Rule 60(b), a court may always consider whether the moving party has acted equitably"). JELD-WEN's course of conduct bore every appearance of a tactical gambit designed to destabilize the divestiture remedy: It waited for years, filed the motion just as divestiture appeared imminent (when it would be maximally disruptive), and did so noisily—on the public docket (breaking from the preexisting sealing practices in the case) and accompanied by an entirely optional SEC disclosure. JA__[2464.12-15, 24-26]. Here too, the District Court noted its concerns, JA__[2663.11]*, but it elected to resolve the motion against JELD-WEN on the merits.

The "district court [would be] in a better position to consider [such] arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 515 (4th Cir. 2015) (remanding accordingly).

## B. Absent Affirmance, Remand Would Be Necessary to Allow the District Court to Determine the Equitable Path Forward

JELD-WEN's appellate arguments challenge divestiture generally and divestiture to Woodgrain; none is (or could be) an argument that JELD-WEN did not violate the Clayton Act. Thus, even if every one of JELD-WEN's arguments were correct in concept, an unremedied violation of the Clayton Act would remain. JELD-WEN offers no reason why it should regain unchecked control of an unlawfully acquired asset, giving it open-ended power to inflict anticompetitive harms on Steves and others in the market.[7] Some remedy would be required.

---

[7] JELD-WEN implies that the damages it paid Steves bought and paid for its unlawful merger. *E.g.*, Opening.Br.26 (asserting that divestiture "served no purpose except to punish JELD-WEN for its loss at trial—a loss for which it already paid treble damages"). Nonsense. The jury's damage award compensated Steves for *past harm* Steves had already suffered. *See* JA__[1022.2] (jury verdict); *Steves*, 988 F.3d at 699 (vacating alternative award of damages for future lost profits in lieu of divestiture). And, after trial, JELD-WEN was subject to a court-ordered, court-supervised supply agreement with Steves, aimed at preventing JELD-WEN from wielding its sustained unlawful market power to inflict additional harms. *E.g.*, JA__[1852.13-14]*, JA__[2110]*. If Towanda returned to JELD-WEN's control, its Clayton Act violation would again be a pressing and present problem, not a thing of "the distant past" (Opening.Br.3).

That remedial question would, in turn, be significantly complicated by the fact that Woodgrain, not JELD-WEN, now owns Towanda. JELD-WEN initially resisted closing the sale before appeal, but it ultimately agreed that the sale should close, did not seek a stay pending appeal, and did not seek to expedite this appeal. JA__[2630.3]; JA__[2651.1-2]. As JELD-WEN anticipated, that closing prompted "fundamental business changes that…cannot be easily undone." JA__[2630.8] (citation omitted). The difficulty of unwinding those changes affects the equities: Even if divestiture to Woodgrain was not equitable in the past, upending today's status quo may not be equitable either. And even if unwinding the transaction were warranted—an issue JELD-WEN never contends with—doing so would pose issues such as what money should change hands and who should control Towanda (and on what terms) during remand proceedings. From there, the District Court would be back at remedial square one, seeking a new path forward to prospectively remedy JELD-WEN's violation of the Clayton Act.

* * *

None of the foregoing should be necessary—but the fact that all would become necessary if JELD-WEN's arguments were accepted further confirms that the District Court exercised sound discretion to successfully close the saga required to address JELD-WEN's unlawful acts.

# CONCLUSION

The District Court's orders should be affirmed.

July 14, 2025

By: /s/ *Anthony P. Badaracco*
    Anthony P. Badaracco

Anthony P. Badaracco
DORSEY & WHITNEY LLP
51 West 52nd Street, 9th Floor
New York, New York 10019
(212) 415-9200

Michael A. Lindsay
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600

*Attorneys for Intervenors-Appellees*
*WG Towanda LLC & Woodgrain Inc.*

Respectfully submitted,

By: /s/ *Benjamin J. Horwich*
    Benjamin J. Horwich

Benjamin J. Horwich
Rebecca L. Sciarrino
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000

Glenn D. Pomerantz
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100

Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
(202) 220-1100

Lewis F. Powell III
Maya M. Eckstein
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200

Marvin G. Pipkin
PIPKIN LAW LLP
10001 Reunion Place, Suite 640
San Antonio, Texas 78216
(210) 731-6495

*Attorneys for Plaintiff-Appellee*
*Steves and Sons, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Although Appellees believe that existing precedent and the District Court's clear factual findings dispose of this case, Appellees request oral argument in recognition of the fact that argument may assist this Court in reviewing the substantial record developed over the nine-year history of this case.

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced 14-point font using Microsoft Word.

July 14, 2025                    By: _____*/s/ Benjamin J. Horwich*_____
                                          Benjamin J. Horwich